## IN RE WILL OF FLORENCE HALL, DECEASED.

(Filed 2 March, 1960.)

**1. Wills § 23b—**

Testimony of testatrix's mental incapacity before and after the execution of the instrument is competent only insofar as it tends to throw light upon her testamentary capacity at the time of executing the instrument, and therefore such testimony must be limited to a reasonable time before and after the crucial time, and what is a reasonable time must be determined in accordance with the facts and circumstances of each particular case.

**2. Same— Prior occurrences held too remote in point of time to be competent on issue of mental capacity.**

Where abundant evidence of testatrix's mental incapacity two years before and two years after the time of the execution of the instrument is admitted, the exclusion of testimony of an occurrence some ten years prior to the execution of the instrument, when testatrix gave an acquaintance a lot and some money, and the exclusion of testimony of declarations by testatrix, a women of some age, as to her engagement for a short time to a young man, who procured a large sum of money from her some four years prior to the date the instrument was executed, *held* not prejudicial, the testimony of one witness as to such declarations by testatrix having been admitted for the limited purpose of showing the condition of testatrix's mind at the time the witness knew her, and there being no request by caveators that the testimony of the other witnesses as to such declarations should be admitted for this limited purpose.

**3. Wills § 23c—**

Undue influence must ordinarily be established by circumstantial evidence relating to the effect of a long course of conduct upon the mind of testatrix, and therefore proof of undue influence must usually cover a multitude of facts and circumstances forming a pattern.

**4. Same—**

The determination of whether incidents and circumstances relating to testatrix are too remote in point of time from the execution of the paper writing to render evidence thereof competent as tending to establish undue influence at the crucial time, is not susceptible to arbitrary rule, but must be left in large measure within the discretion of the trial court.

**5 Same—**

The exclusion of testimony that testatrix aided an acquaintance of long standing by giving him a lot and advancing him money *held* not erroneous, it appearing that the transaction occurred more than ten years prior to the execution of the instrument, and that the recipient of the gift was not a beneficiary under the will and was not charged with exerting any undue influence.

**6. Wills § 22—**

The burden is upon appealing caveators to show prejudicial error in the exclusion of evidence.

**7. Wills § 23c—**

Testimony of declarations of testator which disclose his state of mind or tend to show that he did or did not act freely and voluntarily at the time of executing the instrument is competent as substantive proof on the issue of undue influence, and testimony of other declarations of testator when relevant, may be admitted as corroborative evidence, although such corroborative testimony alone is insufficient to establish the fact at issue.

**8. Same—**

Testimony of declarations of testatrix in regard to her involvement with a young man, to whom she was engaged for a short time, and who obtained a large sum of money from her some ten years prior to the execution of the instrument, is competent solely as corroborative evidence of her state of mind at the time of executing the instrument, and where the testimony of one witness as to such declaration is admitted for this purpose, the exclusion of testimony of other witnesses of like declarations will not be held for error in the absence of request by caveators that it be admitted for the purpose of corroboration.

**9. Appeal and Error § 1—**

Correct rulings of the court in regard to the admission of testimony on the issues of undue influence and mental capacity on the basis of whether the evidence related to instances reasonably near in point of time to the execution of the will, will not be disturbed because of intimation by the court that it would rule upon such testimony arbitrarily on the basis of whether the instances occurred within two years before or two years after the execution of the instrument.

**10. Wills § 23b—**

A witness may relate incidents of conversation, conduct and demeanor of testator which tend to show testamentary capacity or want thereof, and it is not necessary that such witness have or express an opinion as to the mental capacity of testator, or that the incident or incidents related be known to another witness who expresses such opinion.

**11. Same—**

The exclusion of testimony of one witness as to an incident bearing upon testatrix's mental incapacity will not be held for prejudicial error when the incident excluded is remote in point of time to the execution of the paper writing and an abundance of testimony of other witnesses is admitted in regard to incidents less remote.

**12. Appeal and Error § 41—**

The exclusion of cumulative evidence will not be deemed prejudicial unless there is some reasonable likelihood that its admission would have changed the result of the trial.

---

---

**13. Wills § 23c: Evidence § 26—**

While former inconsistent wills may be competent upon the issue of undue influence, where a prior will is not offered in evidence or its unavailability shown, the court correctly excludes testimony as to the provisions of such former will, since the paper writing itself is the best evidence of its contents.

**14. Trial § 32—**

Where the record does not show that a request for special instructions were signed and tendered in apt time, an exception to the failure of the court to give such instructions will not be sustained.

**15. Same—**

It is not required that the court give instructions requested in the exact language, it being sufficient if the pertinent and applicable portions of the requested instructions are substantially given in the charge.

**16. Trial § 33—**

In a protracted trial it is not error for the court, after the jury had been deliberating for a number of hours, to have the jury returned to the courtroom and to remind the jury of the gravity and importance of their position and the duty imposed on them to discuss and consider the evidence with deliberation, and to compose their differences and return a verdict if they can conscientiously do so.

**17. Trial § 48—**

Jurors will not be allowed to attack or overthrow their verdict, nor will evidence from them be received for such purpose.

**18. Trial § 52—**

The failure of the court to set aside a verdict in its discretion upon learning that one of the jurors took into the jury room an Encyclopedia and read to the other jurors a definition of law involved in the suit, will not be disturbed on appeal, it appearing that the definition contained in the Encyclopedia was more favorable to appellants than the correct rule of law and that the incident, although erroneous as a matter of law, was not sufficiently prejudicial to require the exercise of the discretionary power of the court.

BOBBITT, J., concurs in result.

HIGGINS, J., dissenting.

PARKER, J., joins in the dissent.

APPEAL by caveators from *Carr, J.*, January 1959 Civil Term, of DURHAM, docketed and argued as No. 667 at Fall Term, 1959.

Mrs. Florence Hall died 8 June 1955 at the age of 85 years and left a paper writing purporting to be her last will and testament. It was probated in common form by the Clerk of Superior Court of Durham County on 10 June 1955. Fannie E. Baker, half-sister of decedent, filed caveat on 8 June 1956. Answer to caveat was filed by

W. H. Penny, the executor named in the paper writing, and by the
*guardian ad litem* for the unknown heirs and next of kin of decedent.
The four devisees and legatees named in the purported will are resi-
dents of Durham and none of them are related by blood or marriage
to the testatrix. Twenty-eight of her heirs at law and next of kin are
named in the caveat. Nine of these reside in Currituck County, two
in Perquimans County, one in Cumberland County, one in Craven
County, eleven in the State of Virginia, and the residences of four
are unknown.

Florence Hall, *nee* Ballance, was born 17 August 1870. The record
is not specific as to her place of birth, but it is inferred that Curri-
tuck is her native county. She was orphaned at an early age. A rela-
tive sent her to Oxford Orphanage when she was eight years old. She
was reared and educated there. It does not appear of record that she
ever again resided in her native county or eastern North Carolina.
She married J. S. Hall. He was in the undertaking business and at the
time of his death in 1928 was co-owner of Hall-Wynne Funeral Home
of Durham. Mrs. Hall spent her adult life in Durham. She did not
bear a child. She and her husband adopted a son but he died at the
age of eighteen.

So far as the record discloses, the last time testatrix ever saw one
of her relatives was in 1931 and none of them ever visited her in Dur-
ham. What property she had was left to her by her husband. The
estimated value of her property at the time of her death was $150,000,
of which approximately $42,000 was personal property consisting
principally of money.

Several of caveators' witnesses testified to declarations of Mrs.
Hall concerning her kinspeople. Mrs. Geneva Conklin: "She said
that she didn't know if she had any people living or not, that she
believed they were all dead. And once every now and then she would
mention someone in her family, and where she came from and who
she was before she married, and about her life in the orphanage."
Mrs. Sarah Mangum: "I never heard her say anything about her
relatives except for the one half-brother who carried her to the or-
phanage. I don't think she liked that . . . Mrs. Hall said she was go-
ing to leave the money to people that had been good to her." Mrs.
Margaret Kemp Kersey: "Yes, she told me that her half-brother sent
her to the orphanage when she was a young child. Yes, she was reared
there until she got married."

The pertinent parts of the purported will are as follows:

"Second. At the time of executing this last will and testament I
have conveyed by deed my two-thirds interest in certain property

known as 111 E. Chapel Hill Street and 108 Morris Street, now occupied by Penny Furniture Company, to my friend, W. H. Penny, subject to my life estate. I hereby affirm said conveyance and said deed, and it is my desire that said W. H. Penny have this property as conveyed to him.

"Third. At the time of executing this last will and testament I have conveyed by deed certain property known as 605 Mangum Street and a house and lot at 103 Broadway Street to my friend, W. B. Julian, subject to my life estate. I hereby affirm said conveyance and said deed, and it is my desire that said W. B. Julian have this property as conveyed to him.

"Fourth; I devise and bequeath to my friend, Hubert M. Brown, six (6) shares of Citizens National Bank Stock.

"Fifth; I have left a letter to my friend, W. H. Penny, directing him as executor of my estate to give to certain other of my friends certain personal property upon my death. I hereby devise and bequeath to my friend, W. B. Julian, such furniture and household equipment within my house on Mangum Street that I have not instructed my Executor to deliver otherwise in said letter referred to above.

"Sixth; I devise and bequeath all the residue of my estate, regardless of the type of property, whether real or personal, to my friends, Hubert M. Brown, W. B. Julian, R. R. Cannada and W. H. Penny, share and share alike. In the event that any of the four above named parties shall predecease me, then I desire that the residue of my estate shall be divided between those surviving me at the time of my death, share and share alike.

"Seventh. I have devised and bequeathed the above property to my friends and have purposely omitted devising and bequeathing any property whatsoever to any of my relatives. The above named parties have been friends of mine for many years and have rendered many favors to me and/or my deceased husband. It is the desire and intent of this will that I bequeath my property in the manner set forth above, and in order to make my intent and purpose more certain, I have conveyed certain property above referred to by deed to W. H. Penny and W. B. Julian, subject to my life estate, in order that there can be no mistake as to the intent and purpose of this will. In the event any question is raised as to said conveyance made by me, I hereby devise and bequeath said property as designated in paragraph two of this my last will and testament to my friend W. H. Penny, and I hereby devise and bequeath said property designated in para-

graph three of this my last will and testament to my friend, W. B. Julian.

"Eighth. My executor shall not be required to furnish bond.

"Ninth. I hereby constitute and appoint my friend, W. H. Penny, my lawful executor . . ."

This paper writing was signed by Florence Hall on 29 August 1951 and attested by three witnesses.

The caveat alleges that the execution of the paper writing was obtained by the undue influence of W. H. Penny, the named executor and principal beneficiary, and at the time of execution thereof testatrix lacked mental capacity to make a will.

At the trial nineteen witnesses testified for propounders and ten for caveators. The trial lasted for approximately a week. The evidence was in sharp conflict on the issues of mental capacity and undue influence.

Issues were submitted to and answered by the jury as follows:

"1. Was the paper writing, dated August 29, 1951, and offered for probate as the Last Will and Testament of Florence Hall, executed according to law? Answer: Yes.

"2. Did Florence Hall, at the time of the execution of said paper writing, August 29, 1951, lack sufficient mental capacity to make a will? Answer: No.

"3. Was the execution of said paper writing procured by the exercise of undue influence over Florence Hall, as alleged in the Caveat? Answer: No.

"4. Is said paper writing, dated August 29, 1951, as propounded, and each and every part thereof, the Last Will and Testament of Florence Hall, deceased? Answer: Yes."

From judgment declaring said paper writing to be the last will and testament of Florence Hall, caveators appealed and assigned errors.

*Arthur Vann and Wilton Walker for Caveators, appellants.*

*E. C. Brooks, Jr., Reade, Fuller, Newsom & Graham, and James T. Hedrick for Propounders, appellees.*

MOORE, J. Caveators noted 128 exceptions and made 60 assignments of error. The record, including assignments of error, contains 368 mimeographed pages and the briefs contain 91 pages in addition. All have been carefully read, noted and considered by the Court. It would serve no useful purpose to discuss the assignments of error *seriatim*. They will be examined in their application to the questions of law raised in appellants' brief.

(1). Caveators insist that the court erroneously set up, at the beginning of the trial, an arbitrary time limit of two years before and two years after the execution of the will on 29 August 1951 beyond which no evidence of conduct, transactions, declarations or condition of testatrix would be admitted. They contend that the court adhered to this arbitrary rule and thereby excluded relevant, material and competent evidence favorable to caveators and bearing upon the questions of mental capacity and undue influence.

Testimony of caveators' witness, Harold Mangum, to the following effect, was excluded: He is 47 years old and has known Mrs. Hall since he was 7 or 8 years of age. Prior to 1941 she gave him a vacant lot "right at the old city limits" of Durham and advanced $2,000 to help him build a house there.

Mrs. Geneva Conklin testified in substance without objection: She first became acquainted with Mrs. Hall "about April or May of 1951" and saw her often thereafter. Mrs. Hall told her she had had "quite a bit of trouble with a young man," George Whitfield, had bought him a Cadillac automobile, had given him a deed to property in Hendersonville and had gone with him on a trip to Hendersonville. Mrs. Hall further stated that Whitfield was in his early twenties, she had intended to marry him, had gotten a marriage license for that purpose but had been advised against the marriage by another man, and Whitfield had gotten her out of forty to forty-five thousand dollars. Mrs. Hall "dwelt on it all the time." Mrs. Hall was not definite in her statements as to the time of these transactions with Whitfield.

The record discloses that Whitfield was married to another woman on 15 February 1947 and such transactions as were had by testatrix with Whitfield were about the years 1946 and 1947.

. At the close of the evidence for caveators the court made the following ruling with respect to Mrs. Conklin's testimony above summarized: "Gentlemen of the Jury, . . . (Mrs. Geneva Conklin) . . . stated that Mrs. Hall talked about the transactions quite a bit, and that the transactions she had with this young man seemed to be on her mind. The court instructs you that as to that testimony you may consider the fact that Mrs. Hall . . . seemed to have a transaction of that kind on her mind a good deal as it might tend to show a condition of her mind at the time Mrs. Conklin knew her. But as to the exact details of what took place between Mrs. Hall and the young man George Whitfield . . . you will not consider them, and disregard them and erase them from your mind and do not permit them to influence you in your verdict." Caveators excepted to this instruction.

In the absence of the jury, Mrs. Sarah Mangum and Mrs. Mar-

garet Kemp Kersey, caveators' witnesses, and W. B. Julian and Hubert M. Brown, propounders, related similar declarations by Mrs. Hall, some in more and some in less detail than Mrs. Conklin. Mrs. Kersey stated that her conversations with Mrs. Hall were in 1949 and that sometime prior thereto she had seen Whitfield at Mrs. Hall's home "many a-time," but she was not definite as to the year or years. Mr. Julian testified that he met Whitfield in 1948 and had conversations with Mrs. Hall about him that year. Mr. Brown stated that in 1947 Mrs. Hall showed him a marriage license, he didn't read the names on it, he asked her if she knew what she was doing and she said she had a right to do what she wanted to, that she tore the license in two in the course of the conversation.

Upon objection, the court excluded the evidence summarized in the preceding paragraph on the ground that the transactions related by Mrs. Hall to the witnesses were too remote in time, having occurred four to four and one-half years prior to the execution of the will. The record discloses no exception to the exclusion of Mr. Julian's evidence. *Jones v. Jones,* 235 N.C. 390, 391, 70 S.E. 2d 13. It does not appear from the record that caveators requested that the excluded evidence be admitted for the limited purpose of showing the state of testatrix's mind, as was done with respect to Mrs. Conklin's testimony.

We must consider the relevancy and competency of the evidence in question as it relates both to mental capacity and undue influence. The rules of admissibility of evidence are somewhat different on these issues.

Upon the second issue the ultimate inquiry was whether or not Mrs. Hall had testamentary capacity at the time she signed the paper writing on 29 August 1951. The competency of a testator to make a will is to be determined as of the date of its execution. *In re Will of Hargrove,* 206 N.C. 307, 309, 173 S.E. 577. Evidence of capacity at other times is important only in so far as it tends to show mental condition at the time of such execution. *In re Will of Stocks,* 175 N.C. 224, 225, 95 S.E. 360.

"The decided weight of authority upon the subject is to the effect that the conversation, acts, conduct and general demeanor of a testator or testatrix previous to the execution of a will, at the time of the execution, and subsequent to the execution thereof are competent and relevant upon the issue of testamentary capacity. . . . The rule of reason has been adopted as the law in this State. In the *Will of Stocks,* 175 N.C. 224, 95 S.E. 360, the Court quoted with approval the utterance of the Minnesota Court, as follows: 'Where the issue is the mental capacity of the testator at the time of making the will, evi-

dence of incapacity within a reasonable time before and after, is relevant and admissible.' Naturally, it will be inquired what is meant by reasonable time. No precise or mathematical definition can be fashioned. The term itself is ordinarily clearer than definitions. Usually definitions cloud rather than clarify. The interpretation of the term must ultimately depend upon the variability of given facts and circumstances." *In re Will of Hargrove, supra.* ". . . (T)he matter rests very largely within the discretion of the trial court according to the circumstances of the particular case. While it has been said that much latitude should be allowed in the admission of this evidence, such evidence must be sufficiently near in point of time to aid in determining the testator's condition at the time of execution, and if evidence is too remote in point of time, it may be excluded." 94 C.J.S., Wills, sec. 50, p. 752.

In the instant case, near the beginning of the trial but after six witnesses had testified and while Mrs. Conklin was on the witness stand, the court, addressing the attorneys, said: "I rather think it is a part of wisdom here to adhere as closely as possible to the rule laid down in the Hargrove case, namely, that some two years, or probably three in some instances, have not been disapproved. . . . I think you are treading on questionable ground if you undertake to exceed the Hargrove rule either way. . . . And I am rather inclined to restrict it to that period, and only pass on its competency if you go to the four years when that becomes absolutely necessary. I think the Hargrove case is authority for that. I believe if you will follow that rule you will be on safe ground, and when you get above two years before and after, you are to get in sort of dangerous territory." After making this statement, the court in nearly every instance limited the evidence with respect to testatrix's conduct, transactions, discussions and condition to that period within two years before and after the execution of the will.

*In re Will of Hargrove, supra,* is the case referred to by the court; it was followed very closely in the trial of the case *sub judice.* In the Hargrove case the testatrix was an elderly woman, though her exact age was not given, and she was never married. The will was executed 27 February 1906; testatrix died in 1930. Under the will nearly all property was devoted to religious purposes. Caveat was filed by certain nephews. Sixteen of caveators' witnesses had not known testatrix until after the execution of the will. They made her acquaintance at times ranging from two to twenty years after the will was made. All testified that in their opinion Miss Hargrove did not have testamentary capacity on 27 February 1906. The Court said:

"There is no evidence that the testatrix suffered with a disease tending to produce mental impairment and progressive in its nature. The opinions of the witnesses referred to were based upon disconnected and unrelated incidents. . . . At least, it can be stated that no case in this State has been called to the attention of the Court in which disconnected incidents occurring more than two or three years after the execution of the will have been approved in determining mental capacity. Therefore, the Court is of the opinion that such evidence, whether offered by propounders or caveators, is incompetent. However, it is not to be assumed that the Court intends to prescribe a time limit. The best that appellate courts can do in dealing with the subtle processes of the mind is to interpret facts in such cases by the rule of reason and common sense."

The case at bar is in some respects analogous to the Hargrove case. Miss Hargrove and Mrs. Hall were both elderly women. Neither had any immediate family. Miss Hargrove suffered no disease tending to produce mental impairment and progressive in its nature. Dr. Waldo Horne testified that he had been Mrs. Hall's physician for about fifteen years, from 1949 to 1953 he had seen her professionally three to five times a year, "her physical condition was good . . . she did have a bad heart at that time . . . she did not have a bad heart in 1949 to 1951 . . . later she had a bad heart," he treated her most of the time for "flu, colds and such things," and she did have some slight high blood pressure. There was some lay testimony of heart trouble, high blood pressure and dizziness. Mrs. Conklin testified she did not see any change in her mind from 1951 to 1953. There is no testimony of a sudden or abrupt change in her physical or mental condition at any time prior to her death.

There is abundant evidence from caveators' witnesses tending to show testamentary incapacity from 1949 to 1953. The following statements are typical: She was incapable of managing her affairs, was old, weak, nervous and mixed up emotionally. Her conversations wandered from one subject to another, she repeated things over and over, her memory was bad. She was disturbed over the affair with the young man. She imagined she heard knocking at the door, her telephone and doorbell ringing, and people eavesdropping on her telephone line. She didn't like people, said nothing good about anyone, didn't like children. She sat on her porch and made faces and vulgar remarks to passersby and people next door, would get up, turn her back and flirt her skirt-tail at them, and thought people were talking about her and laughing at her. She had no idea of the value of her

property and wanted to tear down one of her houses. Once she said if she had a gun she would "go out killing."

In the light of all the circumstances and the evidence adduced by caveators and admitted by the court, we cannot say that it was an unreasonable exercise of discretion for the court, on the question of testamentary capacity, to exclude the Mangum transactions which took place more than ten years prior to 29 August 1951, or to exclude the declarations of Mrs. Hall with respect to her transactions with Whitfield four to four and one-half years before this date. Furthermore, the court permitted the jury to consider the testimony of Mrs. Conklin with reference to the Whitfield transactions in so far as "it might tend to show a condition of her (Mrs. Hall's) mind at the time Mrs. Conklin knew her." Had a request been made and allowed for the testimony of Mrs. Mangum and Kersey and Messrs. Julian and Brown to be considered by the jury in the same manner it would have been merely cumulative. The Mangum and Whitfield transactions are isolated and disconnected incidents having no direct relation to the time of the execution of the will other than such effect as the latter may have had on testatrix's state of mind. And as to that, caveators had the benefit of it and the jury undoubtedly considered it.

We come now to the question as to whether or not the court erred in excluding this evidence on the issue of undue influence. Caveators contend that the rejected evidence shows definite susceptibility to influence on the part of testatrix.

"Undue influence is frequently employed surreptitiously and is chiefly shown by its results. When the issue of undue influence is raised, the question presented is usually one of the effect of a long course of conduct upon the mind of the testator at the time the will is made, and the evidence by which it is established is usually circumstantial. *In re Will of Lomax*, 226 N.C. 498, 39 S.E. 2d 388; (and other citations). In the Lomax case, speaking of evidence to show undue influence in a will case, the Court said: 'almost necessarily the proof must cover a multitude of facts or circumstances going into the pattern' . . ." *In re Will of Thompson*, 248 N.C. 588, 593, 104 S.E. 2d 280.

The question of remoteness of evidence bearing on the issue of undue influence is, to a large extent, in the discretion of the trial court; there is no arbitrary rule as to the time over which the inquiry may extend. *In re Everett* (Vt. 1933), 166 A. 827; Annotation: 124 A.L.R., Will Contest — Remoteness, sec. II, pp. 434 *et seq.*

The court ruled that testatrix's transactions with Mangum were too remote. It must be borne in mind that the caveat alleges that the purported will was obtained by the undue influence of W. H.

Penny. Mangum's transactions occurred more than ten years before the making of the will and had no relation to any of the activities of Penny. It does not appear from the record that Penny knew Mangum or had any knowledge of Mangum's dealings with Mrs. Hall. Mrs. Hall knew Mangum when he was a little boy, and prior to 1941 gave him a lot in the edge of town and *advanced* him $2,000 to aid in building a home. The probative value of these incidents in showing susceptibility to influence is trivial. Besides, they have no bearing at all upon Penny's exertion of undue influence upon Mrs. Hall. They are not only remote in time but remote in effect. Mangum was not named in the will. The exclusion of this evidence was proper and not an unreasonable exercise of discretion. The burden is upon caveators to show prejudicial error. *In re Will of Thompson, supra,* at page 598.

The Whitfield transactions appear only through the declarations of testatrix.

It is generally held that "Declarations made either before or after the execution of the will, but not part of the *res gestae,* are mere hearsay and are not admissible as direct evidence of the exercise of fraud or undue influence. They may be received in evidence, however, to show the state and condition of the testator's mind. Thus, they may be admitted to prove or disprove his weakness of mind and consequent susceptibility to undue influence, or his feelings and attitude toward, and relations with, persons mentioned in or excluded from his will, . . . In some cases, where there has been other independent evidence of undue influence, declarations of the testator have been admitted as corroborative evidence; and on the other hand, it is held that such declarations are admitted only as corroborative evidence, and cannot properly be received where there has been no foundation laid with other evidence. Thus, where undue influence is shown by other evidence, the testator's declarations may be admitted in evidence, not to show the existence or exercise of such influence, but to show the effect it had on his mind. When the courts do permit the declaration of a testator to be received in evidence, they do so with great caution and confine it strictly to the purpose for which it is admitted. . . . Declarations of the testator which show that he was influenced by a person other than the one charged with procuring the will by undue influence has been held to be inadmissible. . . . Declarations made by the testator, in order to be admissible, must be made at a time not too remote from the making of the will. Where no time is fixed to indicate how long before the making of the will the declaration was made, such statement is not admissible. Declarations made a long time prior or subsequent to the time of the execution of the

will may be inadmissible as too remote. The determination of whether or not a declaration is too remote has been held to rest somewhat within the discretion of the court, and that remoteness was to be measured in terms of causation and relation to the issue, rather than in terms of time." 94 C.J.S., Wills, sec. 247, pp. 1112-1116.

Our Court has not always followed the majority view as to admissibility and effect of testator's declarations with respect to the issue of undue influence. *In re Will of Ball,* 225, N.C. 91, 33 S.E. 2d 619; *In re Craven,* 169 N.C. 561, 86 S.E. 587; *In re Fowler,* 159 N.C. 203, 74 S.E. 117; *Linebarger v. Linebarger,* 143 N.C. 229, 55 S.E. 709; *Kirby v. Kirby,* 44 N.C. 454; *Howell v. Barden,* 14 N.C. 442; *Reel v. Reel,* 8 N.C. 248. *In re Will of Ball, supra,* has a clear and clarifying discussion of this subject. There it is said: "So then with us the rule comes to this. Evidence of declarations of the testator which disclose his state of mind at the time of the execution of the paper writing or the circumstances under which it was executed, tending to show he did or did not act freely and voluntarily, is competent as substantive proof of undue influence. *In re Fowler, supra.* Other declarations, when relevant, may be admitted as corroborative or supporting evidence, but alone they are not sufficient to establish the fact at issue. *Lee v. Williams,* 111 N.C. 200, 16 S.E. 175. See also *In re Shelton's Will,* 143 N.C. 218; *In re Welborn's Will,* 165 N.C. 636, 81 S.E. 1023; *In re Mueller's Will,* 170 N.C. 28, 86 S.E. 719; *In re Bailey,* 180 N.C. 30, 103 S.E. 896."

Whitfield is not a beneficiary under the will. His transactions were not connected with or related to any acts or conduct of Penny. There is no evidence that Penny knew him or had any knowledge of his dealings with Mrs. Hall. Mrs. Hall's declarations concerning her transactions with Whitfield are at best only corroborative evidence and admissible only to show her state of mind and her susceptibility to influence. They are not substantive evidence of the truth of the transactions referred to by her, and as to these transactions themselves her declarations are hearsay. The court admitted the testimony of Mrs. Conklin with respect thereto as bearing upon the state of testatrix's mind. This was proper and admission for any other purpose, over objection and request to limit, would have been error. As already indicated, caveators got the benefit of this testimony under proper instructions. There was no request by caveators for admission of the further evidence on this point for this restricted purpose.

Without objection testimony of many witnesses was admitted to the following import: On occasions Mrs. Hall said she didn't have

a man but could get her a man, the money she was leaving behind would go to Mr. Bennett, a good friend of hers, and other friends. She liked to talk about men and would discuss them and referred to certain men as "nice looking" and "handsome." She was partial to men. When she was "courting" she wore "up to date clothes," said she had a sweetheart to take her out, said she was courting Richard Bennett and said she used to go with George Whitfield and Harold Mangum. She changed a good bit when she went around with boys, didn't want to talk about anything except going with them. The thing she dwelt on most was about young girls and boys, the way young girls acted. There was a man calling at Mrs. Hall's home in 1948 and 1949. He would go there mostly at night. He wasn't married and went with her until the time of her death. When he called she would put the lights out. She said she had helped several young men and this was her form of charity. Bennett fixed her clock and brought her books to read.

There was no prejudicial error in the court's rulings. We do not find them arbitrary in the application made to the evidence offered. The reasons given for the rulings were partially at variance with applicable rules of law, but where, as here, no prejudice is involved the rulings will not be held erroneous. The trial court has the duty not only to insure to all litigants a full and fair hearing but to keep the inquiry within reasonable bounds and bring the proceedings to a reasonably expeditious termination.

(2) In the absence of the jury A. T. Fowler, caveators' witness, testified: He had operated a service station at the corner of Mangum and Broadway for twelve years. Sometime in 1948 a sewer pipe had been laid through Mrs. Hall's driveway. The excavation for the pipe had been filled but the dirt had not settled. She asked Fowler to pack the dirt by running his truck over the driveway and he at first agreed. She then said: ". . . when you get it packed, stay out." This statement annoyed him and he did not pack the dirt. He explained his attitude toward her by saying: "She didn't bother me and I didn't bother her." He expressed no opinion as to her mental competency. The court excluded the evidence from the consideration of the jury and assigned as one reason the remoteness in time.

Counsel for caveators stated that he had proof of any number of isolated incidents such as Fowler had related. "They run into the hundreds . . . just isolated incidents," from which the witnesses "would not have an opinion about her mental condition." After indicating that he "could not rule on it without hearing it," the court said: "Unless they are related to the subject matter that has already

been offered, I don't think they would be competent. That is where the witness comes up with an entirely new act on her part that no other witness has seen or observed, and has no opinion about her mental capacity and offers none, I don't think that would be competent."

The court's statement, next above, is in error. *In re Will of Tatum,* 233 N.C. 723, 727, 65 S.E. 2d 351. In the *Tatum* case, after stating the rules under which a lay witness may express an opinion as to the testamentary capacity of a testator, the court declared: "And, of course, a nonexpert witness who appears to be qualified to give an opinion, nevertheless may refrain from doing so, and elect instead to relate the facts observed by him, and describe as best he can the acts, conduct, and demeanor of the person under investigation. Indeed, prior to the notable decision of this Court (delivered by *Gaston, J.*) in *Clary v. Clary, supra* (24 N.C. 78), it seems that under the rule which prevailed generally in the United States at that time, a lay witness was permitted to relate only observed facts, and never allowed to give an opinion based thereon. Wigmore on Evidence, Third Edition, Vol. III, sec. 1933, p. 31 *et seq.*" It is the law in this jurisdiction that a witness may relate incidents of conversation, conduct and demeanor of testator which tend to show testamentary capacity, or want thereof. And it is not necessary that such witness have or express an opinion as to mental competency of testator, or that the incident or incidents related be known to another witness who did express such opinion.

Caveators did not offer in evidence the "hundreds" of incidents or any of them. So the court's statement was only a declaration, in the abstract, unrelated to anything that actually transpired at the trial save, perhaps, the testimony of Fowler. If the exclusion of Fowler's evidence was erroneous, the error is not sufficiently harmful to warrant a new trial in view of the abundance of evidence of the acts and conduct of Mrs. Hall at a time less remote. The exclusion of cumulative evidence will not be deemed prejudicial unless there is some reasonable likelihood that its admission would have changed the result of the trial. *Fleming v. R. R.,* 236 N.C. 568, 575, 73 S.E. 2d 544; *Freeman v. Ponder,* 234 N.C. 294, 308, 67 S.E. 2d 292; *Realty Co. v. Demetrelis,* 213 N.C. 52, 55, 194 S.E. 897.

(3) Hubert M. Brown, a beneficiary under the will in controversy, was asked on cross-examination: "Mr. Brown, were you the primary beneficiary under Mrs. Hall's will of 1945?" Objection to the question was sustained. Later the court excluded testimony of the same

witness to the effect that W. H. Penny was not a beneficiary under the former will made in 1945.

It is generally recognized ". . . that former wills of the testator, executed at a time when undue influence is not charged or does not appear to have been present, which contains provisions inconsistent with those of the will in contest, may be admitted . . . in support of a charge of undue influence." 57 Am. Jur., Wills, sec. 409, p. 292. See also *In re Will of Mueller*, 170 N.C. 28, 30, 86 S.E. 719; Annotation: 82 A.L.R., Mental Capacity or Undue Influence, p. 970.

Even so, it does not appear from the record that the will of 1945 was ever offered in evidence by caveators or its unavailability shown. The paper writing itself was the best evidence of its contents. *Pegram-West v. Insurance Co.*, 231 N.C. 277, 284, 56 S.E. 2d 607.

(4) Caveators presented to the court written request for special instructions on the issue of undue influence. They noted an exception to the failure of the court to give these instructions.

The request appears in the record following the court's charge and the jury's verdict and is not signed by counsel. There is nothing to indicate that it was presented in apt time. "Requests for special instructions to the jury must be . . . Signed by counsel submitting them . . . (and) must be submitted to the trial judge before the judge's charge to the jury is begun." G.S. 1-181.

Where the prayer for special instructions is properly presented, the court ". . . is not required to give them in the exact words used, and a substantial compliance with the request is sufficient." 2 N.C. Practice and Procedure: McIntosh, sec. 1517, p. 56; *Michaux v. Rubber Co.*, 190 N.C. 617, 619, 130 S.E. 306. While it does not appear that the prayer for instructions was properly made in the instant case, we find that the pertinent and applicable portions of the requested instructions were substantially given to the jury in the judge's charge.

(5) After the jury had deliberated for approximately seven and one-half hours, the court caused them to return to the courtroom and inquired of their progress in arriving at a verdict. They indicated that they were numerically divided ten to two and had made no progress in the last six ballots. The court they stated: "I presume you gentlemen realize was (what) a disagreement means. It means, of course, that it will be another week of the time of the Court that will have to be consumed in the trial of this action again. I don't want to force you or coerce you in any way to reach a verdict, but it is my duty to tell you that it is the duty of the jurors to try to reconcile their differences and reach a verdict if it can be done without any surrender

of one's conscientious convictions. You have heard the evidence in the case. A mistrial, of course, will mean that another jury will have to be selected to hear the case and evidence again. And the Court recognizes the fact that there are sometimes reasons why jurors cannot agree. The Court wants to emphasize the fact that it is the duty of jurors to do whatever they can to reason the matter over together as reasonable men and to reconcile the difference, if such is possible, without the surrender of conscientious convictions and to reach a verdict. I will let you resume your deliberations and see if you can." The jury retired and thirty minutes later returned the verdict.

Appellants contend that the quoted statement was coercive and intimidating and compelled an unwilling jury to reach a verdict. "The trial judges have no right to coerce verdicts or in any manner, either directly or indirectly, intimidate a jury." *Trantham v. Furniture Co.,* 194 N.C. 615, 616, 140 S.E. 300. But we find nothing in Judge Carr's remarks that tends to any such result. They did not indicate any opinion of the court as to the weight of the evidence or what the verdict should be. The court did not know in whose favor the majority of the jury was voting. Instructions in almost identical words have been approved by this Court. *State v. Brodie,* 190 N.C. 554, 557, 130 S.E. 205. Judge Carr's comments are in accord with a long line of decisions in this jurisdiction. *State v. Barnes,* 243 N.C. 174, 90 S.E. 2d 321; *State v. Lefevers,* 216 N.C. 494, 496-7, 5 S.E. 2d 552; *Nixon v. Oil Mill,* 174 N.C. 730, 734, 94 S.E. 410, and many others. "The law anticipates a verdict in every case after the jury have had a reasonable time for consideration." *Osborne v. Wilkes,* 108 N.C. 651, 666, 13 S.E. 285. ". . . (N)o juror, from mere pride of opinion, hastily expressed during the consultation, should refuse to agree . . . it (is) the privilege, and, indeed, the duty of each juror to reason with his fellows concerning the facts in the case, with an honest desire to arrive at the truth, and with a view of arriving at a verdict." *Warlick v. Plonk,* 103 N.C. 81, 83, 9 S.E. 190. Certainly it is not error for the trial court to remind the jury of the gravity and importance of their position and the duty imposed on them to discuss and consider the evidence with deliberation, compose their differences and return a verdict if they can conscientiously do so.

(6) Appellants moved to set aside the verdict and in support of the motion presented to the court affidavits of eight of the jurors who served at the trial. The affidavits are to the effect that one of their number brought to the jury room volume 27 of the Encyclopedia Americana containing a definition of "undue influence," that the definition was read to the jury and a number of them studied it indi-

vidually, and that the jury was influenced thereby. One or more of the affiants stated that the jury felt that Penny had influenced Mrs. Hall in making her will but decided in favor of the propounders because there was no evidence of force or violence.

The Encyclopedia definition of "undue influence" reads: "UNDUE INFLUENCE, a legal term of frequent use in testamentary suits, and sometimes in cases of contested elections. Undue influence in the making of a will is exerted when the testator is so unnaturally influenced that he makes his will in favor of someone other than his natural heirs, — undue influence being oftenest charged when the testator's mind was infirm or weakened by illness and his will was made while he was under the supervision of the outside beneficiary. Where undue influence is proved the court will set a will aside or allow compensation. See WILL.

"In voting, undue influence consists of force, violence, restraint, threat or intimidation practiced at the polls to influence votes to the way of thinking of the person making such demonstration. When proved it vitiates the election and subjects the perpetrator to criminal action. The burden of proof rests on the party making the accusation." Caveators excepted to the denial of the motion to set aside the verdict.

"The jury should make up their verdict upon evidence offered to their senses; that is, what they see and hear in the presence of the court, and should not be allowed to take papers which have been received as competent evidence into the jury room, so as to make a comparison of handwriting, or draw any other inference which their imagination may suggest, because the opposite party should have an opportunity to reply to any suggestion of an inference contrary to what was made in open court. This being the rule as to papers introduced as competent evidence, the use of papers not used in evidence would, of course, be excluded in any case." 2 N.C. Practice and Procedure, McIntosh, sec. 1545, p. 69; *State v. Stephenson*, 218 N.C. 258, 265, 10 S.E. 2d 819; *Brown v. Buchanan*, 194 N.C. 675, 679, 140 S.E. 749. "It is reversible error to permit the jury to take law books with them so that they can determine the law for themselves . . . (I)t generally is ground for reversal that the jury obtained and took into the jury room a dictionary which they consulted to determine the meaning of legal or other terms, which they do not understand." 89 C.J.S. Trial, sec. 465(b), p. 102.

We are here confronted with the fact that all the evidence of use of the Encyclopedia came from the jurors themselves. "It is firmly established in this State that jurors will not be allowed to attack or

overthrow their verdicts, nor will evidence from them be received for such purpose." *Lumber Co. v. Lumber Co.,* 187 N.C. 417, 418, 121 S.E. 755, and cases there cited. This rule has been steadfastly adhered to. *Lambert v. Caronna,* 206 N.C. 616, 621-2, 175 S.E. 303; *Campbell v. R. R.,* 201 N.C. 102, 108, 159 S.E. 327; *Newton v. Brassfield,* 198 N.C. 536, 539, 152 S.E. 499. The rule is a salutary one. If it were otherwise, every verdict would be subject to impeachment.

In our opinion, the patient, painstaking, impartial and learned judge who presided at the trial below would have set the verdict aside in his discretion, notwithstanding the foregoing rule of law, had he considered that the incident worked an injustice to appellants. Indeed, it is difficult to perceive how the definition in question could have prejudiced caveators, despite the affidavits of some of the jurors. A juror sufficiently literate and intelligent to have gained any guidance therefrom would not have applied the portion relating to "elections." It would be ridiculous to suggest that the jury might have thought for one moment that they were passing upon an election case or a case involving undue influence exerted "at the polls." The portion of the definition relating to will contests is more favorable to caveators than that applied by our courts.

"The rationale of the doctrine of undue influence sufficient to avoid a will is that influence is exerted by various means of a kind that so overpowers and subjugates the mind of the testator as to destroy his free agency, and to make him execute a will, which, although his, in outward form, is in reality not his will, but the will of another person, which is substituted for that of the testator. (Citing cases). The undue influence which renders a will invalid must be of a kind which operates on the mind of the testator at the very time the will is made, and causes its execution. (Citing authorities). 'It is not material when the undue influence was exercised, if it was present and operating on the mind of the testator at the time the will was executed.' (Citing authority)." *In re Will of Thompson, supra,* at page 593. ". . . (U)ndue influence is a fraudulent, overreaching or dominant influence over the mind of another which induces him to execute a will or other instrument materially affecting his rights, which he would not have executed otherwise. Or, to put it another way, it means the exercise of an improper influence over the mind and will of another to such an extent that his professed act is not that of a free agent, but in reality is the act of the third person who procured the result." *In re Will of Franks,* 231 N.C. 252, 260, 56 S.E. 2d 668.

We find no error in the refusal of the court to permit the jury to impeach the verdict.

(7) As already indicated, there were many assignments of error. Those not discussed in this opinion present no novel or unusual questions of law. We have carefully considered each of them and find no error that would warrant a new trial.

No error.

BOBBITT, J., concurs in result.

HIGGINS, J., dissenting: The dominant purpose of a jury trial is to determine and declare the truth with respect to disputed issues of fact. The pleadings, the evidence, the argument of counsel, and the charge of the court — these and these only — form the basis for the verdict. The jurors sit together as a body, return the verdict as a body, then disperse. It is a matter of public policy that they should not thereafter be permitted individually to impeach what they did as a body.

However, when it develops that a verdict was influenced by something entirely extrinsic to the trial, taken into the jury room and used in the deliberation which has, or may have, influenced the verdict, it thereby loses its shield from impeachment. This is so for the simple reason that the verdict was not rendered as the law contemplates. No doubt the juror who took his own law to the jury room and used it for the purpose of influencing the verdict, acted in good faith. A juror who is not satisfied with the law as laid down by the court has no right to supplement it by his own research. If this be proper, the next juror who is dissatisfied with the evidence may want to bring in another deed or to call another witness.

In denying the motion to set aside the verdict, the court said: " . . . assuming that there is a variance with the court's instructions, and assuming that some of the jurors followed that in lieu of what the court said, yet can you go into the jury room and prove that without running right head-on into that wall that has been put up that jurors cannot impeach their own verdict. That is the stone wall."

The court ordered the affidavits of the jurors stricken from the motion to set the verdict aside. It seems apparent the court made its ruling refusing to set aside the verdict as a matter of law and not of discretion. I think it was error not to inquire and to act in the court's discretion.

Too, I am unable to agree with the statement in the majority opinion that the best evidence rule prevents a witness from testifying to the contents of a former will (not involved in the litigation) without accounting for the loss or nonproduction of the document.

I vote to set the verdict aside and award a new trial.

I am authorized to say that PARKER, J., joins in this dissent.