Diana R. Smith, Respondent, *v.* Louise M. Keller, Individually and as Executrix of Ellen Raidy, Deceased, et al., Appellants.

Will — undue influence defined — evidence and method of proof of undue influence.

1. A person has the right to use any reasonable and legitimate argument to induce another to make a will in a particular way. A will cannot be avoided because of the influence of another, unless it appears that the influence exerted was so potent at the time the will was made as to take away and overcome the power of a testatrix to act freely and upon her own volition. The influence of another to avoid a will must amount to coercion and duress. The extent to which a testatrix has been controlled, if at all, by another in making a will is a question of fact.

2. Evidence bearing upon the mental state of a decedent is always taken on a question of undue influence, although the declarations are not evidence of the fact contained in the statement. Evidence of acts and conversations of a decedent bearing upon her mental strength is not incompetent simply because it bears upon some other question. But declarations, subsequent to making a will, are improper and incompetent as affirmative statements of fact to prove fraud and collusion.

3. Efforts to obtain from witnesses conversations, including improper and incompetent statements of fact under the guise of showing the mental strength of a testatrix, are condemned, and where such effort has been repeated and continuous and the evidence so obtained is to a large extent relied upon to show undue influence, and is not a mere incident in the receipt of evidence for a proper purpose, it requires that the judgment should be reversed.

*Smith* v. *Keller*, 145 App. Div. 908, reversed.

(Argued March 6, 1912; decided March 19, 1912.)

Appeal from a judgment of the Appellate Division of the Supreme Court in the fourth judicial department, entered May 29, 1911, affirming a judgment in favor of plaintiff entered upon a verdict.

The nature of the action and the facts, so far as material, are stated in the opinion.

*James McCall* and *W. H. Nichols* for appellants. It was reversible error to admit the testimony of the plaintiff as to personal transactions with her mother, the testatrix. (*Hutton* v. *Smith,* 175 N. Y. 376; *Yates* v. *Root,* 4 App. Div. 439; *Fisher* v. *Verplanck,* 17 Hun, 150; *Mitchell* v. *Holland,* 72 App. Div. 224; *Pringle* v. *Burroughs,* 185 N. Y. 375.) The court erred in permitting witnesses to testify to declarations of testatrix made after the making of the will. (*Jackson* v. *Kniffen,* 2 Johns. 31; *Matter of Potter,* 161 N. Y. 25; *Marx* v. *McGlynn,* 88 N. Y. 358; *Waterman* v. *Whitney,* 11 N. Y. 157; *Sanford* v. *Ellithorp,* 95 N. Y. 48; *La Bau* v. *Vanderbilt,* 3 Redf. 384, 390, 392, 412; *Lane* v. *Moore,* 151 Mass. 87; *Mason* v. *Williams,* 53 Hun, 398; *Throckmorton* v. *Holt,* 180 U. S. 552.)

*James O. Sebring* for respondent. No testimony of the plaintiff was received concerning a personal transaction between her and her deceased mother, Ellen Raidy, in violation of section 829 of the Code of Civil Procedure. (*Matter of Zinke,* 90 Hun, 127.) The declarations made by the testatrix both before and after making the will were properly received in evidence. (Abbott's Trial Evidence [2d ed.], 146, 147, 157, 158; Wigmore on Evidence, § 1733; *Marx* v. *McGlynn,* 88 N. Y. 357; *Waterman* v. *Whitney,* 11 N. Y. 157; *Matter of Kennedy,* 167 N. Y. 163; *Matter of Woodward,* 167 N. Y. 28; *Shailer* v. *Bumstead,* 99 Mass. 112; *Haines* v. *Hayden,* 95 Mich. 332; *Roberts* v. *Bidwell,* 136 Mich. 191; *Davis* v. *Davis,* 123 Mass. 590; *Rusling* v. *Rusling,* 30 N. J. Eq. 603.)

CHASE, J. Ellen Raidy duly made her will April 15, 1896. At that time she was a widow with four children. By her will she gave to her daughter Diana one dollar, and divided in equal shares the remainder of her property, real and personal, among her three children, Daniel, Kate and Louise. Daniel died April 20, 1906, leaving a will by which he gave all of his property to his mother,

but provided therein that in case his mother did not survive him then he gave all of his property to his sisters, Kate and Louise. Ellen survived Daniel, and died February 14, 1907. Her will was admitted to probate March 17, 1907. This action was thereafter commenced to determine the validity or invalidity of the probate of the will of Ellen pursuant to the provisions of section 2653a of the Code of Civil Procedure. It is alleged in the complaint in substance that the execution of the will of Ellen was secured by fraud and undue influence, and that at the time of the alleged making and execution of said will and for a long time prior thereto she was weak, sick, aged and infirm and otherwise in such condition that she could be easily influenced, and that her children, Daniel, Kate and Louise, by threats, duress and coercion, compelled her to execute said will and practically disinherit Diana, the plaintiff.

Upon the trial the plaintiff stipulated that no claim of mental incapacity on the part of the testatrix was made by her, and when the case was submitted to the jury the court expressly charged that the competency of the testatrix to make a will is not challenged nor has the evidence justified a finding that she was not competent to make a will. It was claimed upon the trial, however, that the will was not her voluntary act, but that it was procured by the undue influence of Daniel and Kate. Ellen Raidy was left a widow in 1860, eleven days before her youngest child was born. Her oldest child, Daniel, was then about six years old. The family was then living on a small piece of land in Steuben county which had been purchased by the husband, and was in possession of a larger adjoining piece of real property which the husband had a contract to purchase upon payment of certain moneys as provided therein.

Mrs. Raidy, practically unaided except by the work of her children as they became old enough to aid her, not only paid the indebtedness of her husband's estate, but

complied with the terms of the contract referred to, and also purchased and cleared still other lands, and at the time of making the will in question was the owner of several pieces of real property and also of personal property, including investments aggregating in value several thousand dollars. At the time the will was executed the children Daniel and Kate, both unmarried, resided with her. Louise had married ten years before and lived with her husband and family several miles away. Diana, the plaintiff, married contrary to the wishes of her mother and of her brother and sisters two years prior to that time and resided with her husband about half a mile from the home of Mrs. Raidy. Mrs. Raidy, as indicated by her history, was a strong and resolute woman and at that time about seventy years of age. She continued in good physical and mental health for several years thereafter until she had a fall and an attack of pneumonia, after which she ceased to work as she had done in previous years, and upon the death of Daniel, which was a great grief to her, she rapidly declined and died on the day stated. Louise lived three and one-half miles from the village of Bath, where Mrs. Raidy frequently went to transact business with an attorney well known in that county. She had been visiting Louise for several days when on the morning of the day that the will was made she was notified that two men, against each of whom she held a real property mortgage, wished to meet her at the office of the attorney in Bath and pay the mortgages and obtain satisfactions therefor. Louise, with Mrs. Raidy, drove to Bath and Mrs. Raidy went to the office of the attorney while Louise attended to business in other places in town. The business was transacted, the mortgages were paid and satisfied and a new loan was consummated and a mortgage taken therefor, and after such transactions were completed and the men with whom she was dealing had left the office, she told the attorney that she wanted to make her will. She described to him her property and asked if making a

will would affect her rights during her lifetime, and
being told that it would not, she said if she could con-
trol it during her life, she wanted to give it to Daniel,
Kate and Louise.   The attorney being familiar with the
family, asked her specifically in regard to Diana and
discussed the matter of discriminating against Diana
with her.   She concluded by saying: "She has made
me more trouble than all the other children I ever
bore  *  *  *   At last she married a man she knew
the family all objected to, and my heart was broken."
Some further suggestions were made to her by the
attorney, and she replied: "That may be so, but she
shall never have a dollar that I worked to save."
She then said to the attorney that he knew what she
wanted done, and he proceeded to prepare the will, and
it was duly executed.   She requested that he retain the
possession of it.   She was told by him that she could get
the will at any time she wanted it, and that at any time
she wanted to change it she could do so in any way,
or she could revoke it.   It was put in the safe of the
attorney, and remained there until after her death.
After the will was made, from time to time she was at
the office of the attorney transacting business, and on
many of such occasions she was there alone with him.
The attorney also, at one time several years after the will
was made, went to her house, where a deed was prepared
and executed by her of certain property to her daughter
Kate, and he was alone with her there in consultation
for some time.   At none of these interviews did she ever
refer to Diana, or to her will, or suggest that the same
was not as desired by her, or that she wanted to make
any change in it or revoke it.   Although it is claimed,
as we will hereinafter mention, that the son and the
daughter Kate prevented her from seeing Diana, she
lived from the time the will was made until her death
within half a mile of the home of Diana, yet she never
went to see her, and Diana never came to see her mother,

except on two occasions, a few days before her death, neither did either ever speak to the other so far as appears, except on the occasions when Diana came to see her as stated. Mrs. Raidy visited among her neighbors in the vicinity of her home and the home of Diana from time to time during these years, and it is reasonably certain that she could have seen Diana and talked with her, either with or without the knowledge of the children living with her, had she desired so to do.

Assuming as is conceded that the testatrix was competent to make a will, and also assuming that the same was her free and voluntary act, there was nothing to prevent her devising and bequeathing her property as she wished. The circumstances immediately surrounding her at the time the will was made, and the testimony of the draftsman of the will, indicate very strongly that the will was her free, deliberate and intentional act. It is claimed by the plaintiff that the testatrix was under the controlling influence of Daniel and Kate, and that the will was made pursuant to their control and direction. A person has the right to use any reasonable and legitimate argument to induce another to make a will in a particular way. The giving of advice and the use of argument and pursuasion do not constitute ground for avoiding a will made by a competent testatrix even if the will is made in conformity with the advice so given. A will cannot be avoided because of the influence of another, unless it appears that the influence exerted was so potent at the time the will was made as to take away and overcome the power of the testatrix at that time to act freely and upon her own volition. The influence of another to avoid a will must amount to coercion and duress. It is claimed that demands made by one in close relation to another may be so continuous and persistent as to affect the free will of one continuing in such relation when acting in connection with the subject-matter of such demands. The extent to which a testatrix has been con-

trolled, if at all, by another in making a will is a question of fact. ·

Diana was thirty-five years old at the time of her marriage. For fifteen years prior to her marriage she had taught school in the vicinity of her mother's home and except during the time when she was so engaged in teaching school she lived with her mother and assisted in the work performed by the mother and her children. There is no evidence of any lack of harmony in the family or of love for Diana prior to her marriage. Her marriage took place on the morning of April 16, 1894. The evidence presented by the plaintiff shows that the marriage was opposed by the other members of the family. Immediately after the marriage Daniel and Kate denounced it and refused so far as it was possible for them to do so to allow Diana to return to the home. She did not return to them or to her mother. Both Daniel and Kate stated in violent language in the presence of their mother that Diana should never have " one cent of the Raidy money." The testimony presented by the plaintiff also tends to show that the testatrix on the day following the marriage expressed her continued love for Diana and repeatedly asserted that Diana was her child and should have her share of the property. It further tends to show that during the time between the marriage of Diana and the date of the will the denunciations by Daniel and Kate continued and that they repeatedly asserted that Diana should not have " any of the Raidy money " if it was in their power to prevent it. One of the witnesses produced testified to having heard an angry and violent controversy between Mrs. Raidy, Daniel and Kate a few days before the will was made in which both Daniel and Kate insisted upon Mrs. Raidy going to Bath and making her will so as to cut Diana off from any share in her property. She testified that Mrs. Raidy replied that she did not think that it would be right and that Diana should share with the rest of them as she was her child as well as they.

A large number of witnesses were called by the plaintiff and asked to relate conversations subsequent to the date of the will in which Mrs. Raidy took part and in which she made statements in regard to her children and as to her will. They were objected to, and counsel for the plaintiff stated to the court that the evidence was offered upon the question of undue influence. The court ruled: "The evidence of the mental state of the deceased is always taken on a question of undue influence. The declarations are not evidence of the fact contained in the statement, but the evidence is competent." The rule as stated by the court has been often upheld. (*Matter of Woodward,* 167 N. Y. 28.) Evidence of acts and conversations of a deceased bearing upon her mental strength, is not incompetent simply because it bears upon some question other than that of the mental strength of the deceased. The difficulty in this case is that counsel for the plaintiff taking advantage of a rule correctly stated by the court proceeded to call many witnesses, and from them to elicit testimony bearing in a very slight degree, if at all, on the question of the mental strength of the testatrix, but in that way he obtained a large number of declarations by her subsequent to the date of the will which were well calculated to influence the jury, and which doubtless did influence the jury in determining the question submitted to it, as to whether the will was the free and voluntary act of the testatrix. Among the rulings which resulted in filling the record with incompetent declarations from which it is sought to destroy a solemn written instrument, made in accordance with the provisions of statute, a few will be quoted. A witness, called for the plaintiff, testified to a conversation with Mrs. Raidy after the death of Daniel in 1906, and she was then asked:

"Q. What was said in this conversation between you and Mrs. Raidy? [Objected to as incompetent and too remote. Overruled. Exception.]

" A. She said: ' O, dear! If Diana and her children were here now I should be pleased.' * * *

"Q. Did Mrs. Raidy ever say anything to you about what she wanted Diana to have of her property? [Objected to as immaterial, incompetent and a declaration in party's own interest. Overruled. Exception.]

" A. I don't know as she said what she wanted her to have; she said she wished she had done differently than she had by her; I don't remember she said anything else. She said she had cut her down to nothing. She cried. I asked why she did so, and she said she had to."

Another witness was called who said that a year before Daniel died he had a conversation with Mrs. Raidy. Plaintiff's counsel then asked:

"Q. What was the conversation? [Objected to as immaterial and incompetent. Overruled.]

" A. * * * I began to talk of Diana and the children. She said they daresn't come there; she would like to have them there, but she could not. She said Kate wouldn't allow them there. I asked if Dan was willing they should come. She said he wasn't as bad as Kate on that subject."

The same witness was asked as to conversations three years before Daniel died, and he said that Mrs. Raidy told him that " she had a lot of property that she couldn't do as she was a mind to with. She said they controlled her. She meant Kate and Dan." Another witness called by the plaintiff testified that he had a conversation with the testatrix in 1906, and was asked what was said. The defendants objected to the conversation as immaterial, incompetent, inadmissible and too remote. It was received and an exception was taken. The witness answered: " Mrs. Raidy said she was feeling pretty bad and she didn't think she was going to live very long. I asked if she had things fixed to suit her and she said no. I said, why don't you? She said, I wouldn't dare do it. I said why. She said, I am afraid of Kate. I

said, Kate wouldn't hurt you, would she? She said, you don't know her. I said I thought I did. She said, I don't think you do. She began crying about it and we began talking about something else. She said she wanted Diana to have her share. She said there was a will made that she thought could be easily broken. * * * When Kate came back she said, mother what are you crying about. She said I was thinking of Daniel."

. The evidence given on the trial concerning the testatrix and her children and their relations with each other, and of the statements made prior to the date of the will by Daniel and Kate to the testatrix in regard to Diana; and of the statements of the testatrix expressing her love for Diana and her desire that she should share in her property, and of all other statements showing the relations of the testatrix with Daniel and Kate and bearing upon their influence and control over her, together with the will subsequently made in which Diana was given but one dollar, was properly received and left for the consideration of the jury in determining whether Daniel and Kate did exert such an influence over the testatrix at the time the will was made as to prevent her from making the will according to her own deliberate judgment and wishes.

The declarations of the testatrix subsequent to making the will were improper and incompetent as affirmative statements of facts to prove fraud and collusion. (*Gick* v. *Stumpf,* 204 N. Y. 413; *Marx* v. *McGlynn,* 88 N. Y. 357; *Burnham* v. *Brennan,* 74 N. Y. 597; *Kelly* v. *Home Sav. Bank,* 103 App. Div. 141; *Tierney* v. *Fitzpatrick,* 195 N. Y. 433; *Conkling* v. *Weatherwax,* 181 N. Y. 258; *Scheps* v. *Bowery Sav. Bank,* 97 App. Div. 434; *Shailer* v. *Bumstead,* 99 Mass. 112; *Lane* v. *Moore,* 151 Mass. 87; *Throckmorton* v. *Holt,* 180 U. S. 552; Abbott's Trial Evidence [2d ed.], 147; Wigmore on Evidence, sec. 1738.)

Statements made by a testator tending to impeach a will previously made are too unreliable to be admissible

1912.]            Opinion, per Chase, J.            [205 N. Y.]

as a basis for setting aside an instrument made under the formalities required by statute. Such statements may be made for the express purpose of deception or to satisfy impertinent curiosity and importunity or to express agreement with the suggestions of the questioner and thus satisfy the one to whom the declaration is made, or they may spring from a semi-morbid condition that in no way reflects the condition of mind or the purpose of the testator at the time the will was actually executed.

It was said by Judge Thompson and concurred in by Chief Justice Kent and Judge Livingston in *Jackson* v. *Kniffen* (2 Johns. 31, 34) that "to permit wills to be defeated, or in any manner whatsoever impeached, by the parol declarations of the testator, appears to me repugnant to the very genius and spirit of the statute, and not to be allowed." So far as such declarations show the mental strength of the testator's mind, they are allowed for that purpose, but when they are so received they should be confined to the purpose for which they are received. (*Waterman* v. *Whitney*, 11 N. Y. 157, 169.) They should not be remote and should bear upon their face some evidence of the testator's mental condition. The declarations elicited by the questions expressly referred to herein were made from six to ten years after the date of the will, and they were inadmissible for that reason. (*Sanford* v. *Ellithorp*, 95 N. Y. 48–54.) Questions to elicit the mental strength of a testator should be asked for that purpose and not for an incompetent and improper purpose. In this case scarcely a question was asked of any of the witnesses for the plaintiff as to conversations with the testatrix upon a subject other than that of her will and of Diana. Can it be that the mental strength of the testatrix can only be shown by conversations relating to her will and her children ? Is it not perfectly clear that counsel for the plaintiff asked questions calling for particular conversations for the express purpose of getting before the jury statements of fact that might affect them

4

in determining whether the will was the result of coercion and duress? Efforts to obtain from witnesses conversations, including improper and incompetent statements of fact under the guise of showing the mental strength of a testatrix, should be and are condemned, and where, as in this case, such effort has been repeated and continuous and the evidence so obtained is to a large extent relied upon to show undue influence and is not a mere incident in the receipt of evidence for a proper purpose, it requires that the judgment should be reversed. We do not find that any of the testimony received subject to an objection that the same was inadmissible under section 829 of the Code of Civil Procedure was shown at the time of its receipt to have been such a transaction with the testatrix as to make the same inadmissible within the provisions of said section.

The judgment should be reversed and a new trial granted, with costs to abide the event.

CULLEN, Ch. J., GRAY, VANN, WILLARD BARTLETT, HISCOCK and COLLIN, JJ., concur.

Judgment reversed, etc.