(82 Misc. Rep. 16.)

## In re D'ARSCHOT'S WILL.

(Surrogate's Court, New York County. July, 1913.)

1. WILLS (§ 47*)—"TESTAMENTARY CAPACITY."

Where testatrix was able to understand the relationship of her relatives to her, and to recollect what claims any of them had upon her affection and bounty, and appreciated the value of her property, and the scope and bearing of her will, the fact that she was advanced in years, infirm, and suffering from various ailments did not divest her of testamentary capacity.

[Ed. Note.—For other cases, see Wills, Cent. Dig. § 94; Dec. Dig. § 47.* For other definitions, see Words and Phrases, vol. 8, pp. 6929–6931.]

2. WILLS (§ 166*)—PROBATE—UNDUE INFLUENCE—SUFFICIENCY OF EVIDENCE.

Evidence on a contested probate of a will *held* insufficient to show that the will was procured by undue influence.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 421–437; Dec. Dig. § 166.*]

3. WILLS (§ 155*)—UNDUE INFLUENCE.

That the beneficiaries of a will exercise every means of persuasion within their power in the procurement of the will does not constitute undue influence, in the absence of fraud or conspiracy, or a substitution of their volition for that of testatrix.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 375–381; Dec. Dig. § 155.*]

Proceedings upon the contested probate of the will of Countess Gaston D'Arschot, formerly Wilhelmine Detmold. Decree according to opinion.

Robert Thorne, of New York City, for proponents.

Kellogg & Rose, of New York City, for Lentilhon.

Daly, Hoyt & Mason, of New York City, for Boynton.

Alexander T. Mason, of New York City, for Wheeler and Macomb.

Murray, Ingersoll, Hoge & Humphrey, of New York City, for Gilford.

COHALAN, S. The testatrix was an American woman, the widow of Count Gaston D'Arschot of Belgium. Her husband died in 1893. They had no children. For several years she lived abroad with her husband, and after his death returned to America in 1894, to take up her residence at No. 27 West Tenth street, in this city. She lived with her aunt until the aunt's death in 1908, when her nephew, Joseph De Tours Lentilhon, and his family took up their residence with her. The testatrix left surviving her as next of kin eight nephews and nieces, children of her deceased sister. The estate is estimated at about $400,000. Under the will Count Guillaume D'Arschot, a nephew of decedent's husband, and at present the secretary to the cabinet of the king of Belgium, is bequeathed nearly one-third of the estate, and the residue is divided equally between Joseph De Tours Lentilhon and Minna Lentilhon Crook, a blood nephew and niece of the testatrix. The other nephews and nieces of the testatrix are mentioned in the will, but are bequeathed only a few personal remembrances. The pa-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.

per is propounded for probate by Joseph De Tours Lentilhon, one of the executors named therein.   Probate is contested by four of the nieces and one of the nephews upon the usual grounds of testamentary incapacity and undue influence.

[1] All the statutory requirements were complied with in the formal execution of the paper offered for probate, and the contestants raise no question on that ground.   It is urged that the testatrix did not have what is known as "testamentary capacity" at the time she made the will.   It is not necessary to go into any lengthy discussion here as to what is "testamentary capacity."   It has been defined repeatedly by the courts, but little has been added to the definition made into law by the Court of Appeals in Delafield v. Parish, 25 N. Y. 9.   The testatrix was a woman advanced in years, infirm and suffering from various ailments, but she knew who her relatives were, and named them in her will.   The testimony leaves no doubt that she was able to understand their relationship to her and to recollect what claims any of them may have had upon her affection and bounty.   She evidently knew and appreciated the value of her property and the scope and bearing of the provisions of her will.   The objections on the ground of testamentary incapacity are therefore overruled.

[2] The objection on the ground of undue influence is the only one worthy of any serious consideration in this case.   It is charged that Count Guillaume D'Arschot, a nephew of the deceased husband of the testatrix, procured the making and execution of the will by fraud and undue influence practiced upon the testatrix.   It is alleged that the count conspired with Joseph De Tours Lentilhon, another of the three beneficiaries, in fraudulently inducing the testatrix to change her previously expressed testamentary intentions.

There are some facts that clearly appear.   While the testatrix lived in Belgium, during the lifetime of her husband, she had become attached to her husband's nephew, young Count Guillaume D'Arschot. She assisted him in many ways, paid for part of his education, and became interested in his diplomatic career.   In 1894, after her husband's death, the countess made a will in his favor, and in his own words made him her "universal legatee."   The testatrix then returned to this country and took up her residence on West Tenth street.   She did not resume her American citizenship, but preferred to continue as a subject of Belgium and to draw a pension of some $600 per year from the Belgian government.   The count visited her in this country two or three times, and their relations seem to have been cordial and even affectionate until some time in 1906.   During this period many letters passed between them, and the question of a suitable marriage alliance for Count D'Arschot seems to have been the subject uppermost in the mind of the countess.   The countess seems to have been afraid that the count would marry one of the "common people," or only the daughter of a business man, and the count was having difficulty in finding a woman sufficiently aristocratic to please his aunt, and at the same time sufficiently rich to meet his own needs.   The count appears to have become somewhat discouraged over his matrimonial prospects, for in July, 1906, he wrote to his aunt:

"I have looked and people have looked for me and never have I had a serious opportunity. If I ever marry, it will be a matter of money and nothing else."

Again in August of the same year he wrote:

"In the U. S. there is nothing to be done then? Let time bring a golden baboon, who is nice. I believe it more and more·notwithstanding your advice, the only thing to be considered and to put on this question is the 'R. I. P.' of the tombstones."

The contestants contend that the motive of the count in his subsequent relations with the countess regarding the execution of the will in question should be judged from such statements as the foregoing, and, in view of the almost grotesquely affectionate character of the letters that the count subsequently wrote again and again to the countess, an old lady, it can be said that he was evidently actuated chiefly by mercenary motives.

The marriage of the count with a Miss Nubar, of Egypt, plays a very important part in the story of the relations between Count·D'Arschot and the testatrix. The letters written by the count and the testatrix at the time show that the count's marriage was against the wishes and advice of the countess, and that she was very much pained and grieved thereby, notwithstanding the fact that "the fortune, solid, well taken care of, very honest, is valued at between forty and fifty millions (francs);" and that there was "a million and a half of dowry, eight to ten millions more later on; granddaughter of Nubar Pasha, the celebrated statesman." In one of the letters written by the countess to the count she intimated that if he went on with the proposed marriage he would lose the legacy that she had already given him in her will. Nevertheless the count married Miss Nubar and there followed a break in the cordial and affectionate relations that had theretofore existed between him and the countess.

To offset the effect of his marriage upon the countess the count then began a campaign of letter writing, in which he begged, beseeched, and implored her to reinstate him in her affections. There are in evidence almost 200 letters of the count, written to the countess from 1906 to 1911, and they comprise a remarkable and unique chapter in the history of will contests. In some of these letters he reproached her for her apparent neglect and failure to write to him, and in one letter said that he had written her 17 letters within a certain time while she had only written him 3. Some of the count's letters are more like the fervid appeals of an infatuated lover than the letters of a young man to his uncle's widow, who had taken an interest in his future.

The contestants alleged that in 1907 or 1908, after the count's marriage, the countess made a will that bequeathed to the count only those moneys which came to the countess through the D'Arschot family, and revoked the one made in 1894, in which the count was the chief beneficiary. Testimony was offered to prove the making of this will. If such a will had been made by the countess, that fact would be material as showing a change in testamentary intention. However, the evidence offered on this point was very meager, and in my opinion insufficient to establish the fact of its execution.

Counsel for the contestants have submitted an able and exhaustive brief on the facts and on the law of this case. They have examined and analyzed the evidence from every point of view that is favorable to them. But they overlook the fact that the testatrix was one of that class of American expatriates to whom a title of nobility is the great criterion of honor, virtue, and high social position. A title and illustrious family connections were the things she thought most desirable. Throughout her life, after her marriage with the count's uncle, she seems to have permitted herself to be easily swayed and influenced by such considerations. If she was the kind of woman that worshipped a title and permitted herself to be influenced by one who possessed the same title that she acquired by her own marriage, and was pleased to receive the grossest and most extravagant flattery and adulation from the possessor of that title, how can it be claimed that such influence was undue influence in the legal sense of that term? Granted that the count's motives were mercenary, that his own letters prove him to be a fortune hunter, and that he exhausted all his ingenuity in playing upon the affections of a title-worshipping American woman, the fact cannot be overlooked that the testatrix did show great interest in the count throughout his early life, wrote affectionate letters to him, sent money to him at various times, and did various other things, from 1894 to 1907, which showed a great regard for him. The count may have influenced the testatrix in many of these acts, but, if so, it was not the kind of influence which substituted his will in place of hers and compelled her to do what he desired contrary to her independent judgment. I cannot conceive of undue influence in the legal sense extending over a period of 20 years. Beside it does not appear that the testatrix had any particular affection for any of the contestants, or that any of them had any claim upon her except their kinship.

The circumstances attending the execution of the will, which in themselves may appear suspicious, should be considered in this aspect. The Belgian consul, Pierre Mali, interested himself in the matter at the request of the count. Within a day or two of the arrival of the count at the home of the countess, a new physician was engaged for her at the suggestion of the count. When the count asked Mr. Mali to recommend a lawyer to draw a will for the countess, Mr. Mali suggested the name of his nephew, Johnston De Forest. Mr. De Forest took his instructions from the count and Mr. Mali, and never saw the testatrix until he went to her home prepared to have the will executed. One of the witnesses to the will was Mr. Mali, and Mr. De Forest was appointed one of the executors. Mr. De Forest read the will to the testatrix, and she assented to the provisions, supplied some names, and made a few small corrections. The count sailed for home a day or two after the execution of the will, and the countess died about two weeks later. These facts appear rather suspicious and without explanation would seem to indicate fraud. But they are all satisfactorily explained, and are easily understood in the light of the whole history of the relations between the count and the testatrix.

Although the tenor of the count's letters show him to have been a typical European fortune hunter, desirous of bartering his title of no-

bility for money, and not caring where the money came from, as shown by the following extract from one of his letters to the testatrix:

"I would have preferred to have married a Belgian. But in the nobility there are no fortunes, and as to the common people I agree with you; a foreigner is better. Be she therefore Mexican, American or Egyptian, I hardly see the difference, apart from the fact that the American enjoys, one does not know why, special consideration and whenever one mentions an American girl everything is considered all right and that there are millions of dollars"

—nevertheless, I am of opinion that the influence that the count exerted upon the testatrix did not legally amount to fraud, coercion, or duress. It was merely a yielding to the adulation and flattery that she had been pleased to receive from the time the count was able to take advantage of her fondness for the society and attentions of one of the "nobility."

In the count's letters relating to his marriage he very frankly stated to the testatrix that his only object in matrimony was to obtain money. His statements and admissions as to his own fortune-hunting characteristics, far from *unduly* influencing her contrary to her independent judgment, seem rather to have touched a responsive chord in her nature, to which she gave expression by the words in her will: "To my nephew, Count D'Arschot (Guillaume) Ministre resident, chef du Cabinet du Roi à Brussels, Belgium." The testatrix did not make Count D'Arschot one of the chief objects of her bounty because of any fraud or undue influence practiced upon her by him, but because years of habit and a lifelong departure from those sterling principles of democracy that are supposed to be so characteristically American had caused her "to dearly love a lord."

The manifest insincerity of the letters that the count wrote to the countess would have filled an ordinary American woman with disgust, but they seem to have been received by her with pleasure because they were written by her nephew, the count, a member of an "illustrious" family. If this were the will of an average American woman who did not have an exaggerated veneration for titles and trappings of nobility, I think the influence exerted here might perhaps be considered undue influence; but the testatrix was a woman satiated with foreign ideas, who looked upon plain Americans with contempt as being of the "common people," and who was only too pleased to have the opportunity to name the count as one of her beneficiaries.

[3] As a matter of law the count was entitled to use every means of persuasion within his power that did not amount to fraud or conspiracy. Matter of Snelling, 136 N. Y. 515, 32 N. E. 1006. In Smith v. Keller, 205 N. Y. 44, 98 N. E. 215, the Court of Appeals says:

"A will cannot be avoided because of the influence of another, unless it appears that the influence exerted was so potent at the time the will was made as to take away and overcome the power of the testatrix at that time to act freely and upon her own volition. The influence of another to avoid a will must amount to coercion and duress."

The paper propounded will be admitted to probate as the last will and testament of the decedent. Submit decision and decree and tax costs on notice.

Decreed accordingly.