IN THE MATTER OF THE WILL OF BETTY FUTRELL RICKS,
DECEASED

No. 87

(Filed 8 February 1977)

1. **Evidence § 11— dead man's statute — applicability to caveator and propounder**

   A caveator or a propounder in a will contest is a "party" to whom the prohibitions and exceptions of the dead man's statute, G.S. 8-51, apply.

2. **Evidence § 11; Wills § 22— dead man's statute — communications with deceased — competency to show mental capacity**

   A party or an interested witness may, notwithstanding G.S. 8-51, in an action to set aside a will, deed or other writing, testify to communications or conversations with a deceased to show the basis upon which the party or witness has formed an opinion regarding the mental capacity of the deceased, when he testifies to such an opinion, and when the lack of such capacity is a ground for setting aside the instrument.

3. **Evidence § 11; Wills § 22— dead man's statute — mental capacity and other issues presented — admissibility of transactions with deceased**

   In actions to set aside written instruments executed by deceased persons on the ground of mental incapacity where other issues such as undue influence are raised by the evidence, and where testimony of an interested witness is offered relating to transactions or communications with the deceased, the following rules apply: (1) If the probative value of such testimony rests mostly on demonstrating the basis for the witness's opinion as to the deceased's mental state, it is admissible under appropriate limiting instructions notwithstanding the provisions of G.S. 8-51. (2) If the probative value of such testimony rests mostly on demonstrating the basis for such an opinion, it is admissible under appropriate limiting instructions even when the mental state of the deceased is relevant to both the mental capacity and undue influence issues. (3) If the probative value of such testimony rests mostly on its tendency to prove certain facts in issue relevant to issues other than the deceased's mental state, G.S. 8-51 and the hearsay rule render it inadmissible and limiting instructions will not cure the prejudice resulting from its admission.

4. **Evidence § 11; Wills § 22— dead man's statute — transactions with deceased — competency to show mental capacity**

   The trial court in a caveat proceeding properly permitted the propounder to testify to certain personal transactions and communications between the witness and the deceased relating to the execution of the script sought to be propounded, under appropriate instructions that the testimony should be considered only as bearing upon the mental capacity of deceased, where the testimony was offered mostly for the purpose of showing the basis for the propounder's opinion

In re Will of Ricks

that deceased at the crucial time in question had the mental capacity to execute a will, the case was tried primarily on the issue of deceased's mental capacity, and evidence of undue influence was sparse.

5. **Evidence § 11; Wills § 22— statements by deceased — reasons for leaving home to son — admissibility to show mental capacity**

In a caveat proceeding, testimony by propounder's wife that some four days prior to the execution of the script in question the deceased stated to the witness that she wanted to leave her home to the propounder because the propounder's father had built it for him while he was in service was not inadmissible as hearsay but was admissible to show the basis upon which the witness expressed her opinion that deceased possessed the requisite testamentary capacity at the crucial time in question, since the thrust of the evidence was not so much to show why in fact the home was built but was to show the deceased's state of mind regarding her property and that she had a fixed purpose to dispose of it according to the instrument in question.

Chief Justice SHARP and Associate Justices HUSKINS and COPELAND dissent for the reasons stated by Brock, Chief Judge, in the opinion of the Court of Appeals in this case.

PROPOUNDER, in a caveat proceeding, appeals from a divided panel of the Court of Appeals. A majority of the panel (opinion by *Brock, C.J.,* concurred in by *Morris, J.)* determined to award a new trial to caveators who had appealed from a jury verdict and judgment in favor of propounder for an error assigned to *Tillery, J.,* judge presiding at the trial, concerning the admission of certain evidence. *Britt, J.,* dissented, and voted to let the verdict and judgment stand. The case is reported at 28 N.C. App. 649, 222 S.E. 2d 471 (1976). It was argued before us as No. 96, Spring Term 1976.

*Johnson, Johnson & Johnson by Bruce C. Johnson, Attorneys for Propounder Appellant.*

*Weeks, Muse & Surles by T. Chandler Muse and Cameron S. Weeks, Attorneys for Caveator Appellees.*

EXUM, Justice.

The principal question on this appeal is whether it was a violation of General Statute 8-51[1] and error prejudicial to the

---

[1] The statute provides in part: "Upon the trial of an action, or the hearing upon the merits of a special procee ing, a party or a person interested in the event . . . shall not be examined as a witness in his own behalf or interest . . . against the executor, administrator or survivor of a deceased person . . . or a person deriving his title or interest from . . . a deceased person . . . concerning a personal transaction or communication between the witness and the deceased person . . . except where the executor . . . or person so deriving title or interest is examined in his own behalf, or the testimony of the . . . deceased person is given in evidence concerning the same transaction or communication."

caveators to permit the propounder to testify to certain personal transactions and communications between the witness and the deceased relating to the execution of the script sought to be propounded. A majority of the Court of Appeals' panel thought it was, on the ground that this testimony tended to prove "facts essential to establish the will as the voluntary act of the testator and rebut the charge of undue influence . . . . " The majority further ruled that it was impossible for the trial judge to remove this prejudice, as he attempted to do, by instructions directing the jury to consider this evidence only on the issue of the deceased's mental capacity. Judge Britt was of the opinion that admitting the testimony, if error, was not prejudicial inasmuch as "the case was tried primarily upon the issue of lack of mental capacity," the only evidence of undue influence, if any at all, being the very testimony about which the caveators complain. Our view of the case is more nearly like that of Judge Britt's and we reverse.

Betty Futrell Ricks, a resident of Northampton County, died 25 July 1974 survived by five daughters and one son. By writing dated 12 July 1973, purporting to be an attested written will, she sought to devise and bequeath all of her property to her son, Grady Ricks, who was also named executor. After the writing was probated in common form at the instance of Grady Ricks, his five sisters filed a caveat alleging that the writing was the product of the deceased's mental incapacity and undue influence exercised upon her by her son.

The caveat came on for trial at the 7 April 1975 Session of Northampton Superior Court. Four issues were submitted to the jury and answered as follows:

"1. Was the paper writing propounded, dated the 12th day of July, 1973 executed by Betty Futrell Ricks, according to the formalities of the law required to make a valid Last Will and Testament?

"Answer: Yes.

"2. At the time of signing and executing said paper writing did said Betty Futrell Ricks have sufficient mental capacity to make and execute a valid and Last Will and Testament?

"Answer: Yes.

"3. Was the execution of the paper writing propounded in this case procured by undue influence as alleged?

"Answer: No.

"4. Is the said paper writing referred to in Issue No. 1, propounded in this cause, and every part thereof, the Last Will and Testament of Betty Futrell Ricks, deceased?

"Answer: Yes."

The propounder and caveators stipulated that the proper answer to the first issue was "Yes" and the court so instructed the jury. Judgment on the verdict decreed that the writing offered for probate was the last will and testament of Betty Futrell Ricks.

The principal witnesses in the propounder's case in chief were the attorney who drew the will and his secretary who typed it. Both recalled the deceased and her son coming to the attorney's office together. The secretary could recall no conversation she had with either but did recall Mrs. Ricks asking her to witness the will after it was drawn. The attorney recalled that the propounder introduced his mother and said that she wanted the attorney to prepare her will; that Mrs. Ricks told him that she wanted to leave everything to her son and to appoint him executor; and that it was a "completely normal transaction and she seemed to be a completely normal person. It was nothing that struck me to indicate or arouse any suspicion that she was incompetent." He recalled that he prepared the will and on some later day the propounder and his mother returned for the purpose of executing it. It was his opinion that Mrs. Ricks on these occasions possessed the requisite testamentary capacity.

Caveators called some seventeen witnesses who testified regarding the deceased's mental capacity. All but three were either caveators or children of caveators. The caveators and their children all testified to a lack of testamentary capacity on the part of the deceased. Most of these witnesses related a dramatic decline in her mental acuity after she was injured in an automobile accident in July, 1972. According to these witnesses the deceased was mentally normal before this accident. After it, however, she would often become confused and disoriented, failed to recognize her children and grandchildren at times, and at times would not know where she lived or what she owned. There was testimony that the deceased was born 16 De-

cember 1891 and at the time of her death left surviving six children, seventeen grandchildren and sixteen great-grandchildren.

Three witnesses, unrelated to the family, gave similar opinions regarding her testamentary capacity. One was a physician who had treated the deceased for a fractured wrist on 6 November 1973 and who saw her periodically for five or six weeks thereafter. He last saw her on 1 January 1974. Another was the deceased's housekeeper, who worked in the deceased's home one day a week from the late summer of 1973 until May, 1974. A third was a friend of the family.

Evidence in rebuttal for the propounder consisted of the testimony of his daughter, his wife, and himself together with the minister at the church where the family attended, the family physician, and a close neighbor of the deceased. These witnesses were all of the opinion that the deceased at relevant times had sufficient testamentary capacity. The propounder's daughter was of the opinion that the deceased failed rapidly, mentally and physically, beginning in January, 1974, and that by May, 1974, she lacked the necessary capacity to make a will. The propounder's wife testified that on Sunday, 8 July 1973, the deceased told her that she wanted her son to have her house and lot. Then, over objection, she testified that the deceased related that her husband had built the house for their son while the son was in service during the Second World War, had stopped work on it for several months while the son was missing in action, and began work again after the son was determined to be safe. Without objection she testified that the deceased said, "When brother comes back from work which is 11:30, tell him I want to see him tomorrow morning. I want to make arrangements to make a will and talk it over with him."

The propounder then testified, in part, that as a result of his wife's relating this conversation to him he went to his mother's home the next day. Before he testified as to what transpired between him and his mother, the trial judge after a bench conference with attorneys instructed the jury:

"[A]ny party who is interested in the outcome of a lawsuit such as this, that is, the Propounder . . . or the Caveators . . . cannot testify to transactions between themselves and Mrs. Ricks, the lady who is dead. They cannot testify to those transactions, that is for the purpose of proving the

facts which might have been recited in that transaction. They can, however, testify to conversations that they had with Mrs. Ricks solely for the purpose of offering evidence concerning her mental capacity, so when you hear any transaction or conversation between this witness, who is an interested party, and the Caveators also when you hear that testimony, you will keep in mind that you will only consider it as bearing upon what it might show with regard to the mental capacity of the late Mrs. Ricks. It is not for any other purpose. All right, with that instruction to the jury, the objection is overruled."

The propounder then proceeded to testify that his mother told him she wanted to make a will and to leave him the house and lot where she lived. (This property apparently constituted the bulk of her estate.) She asked him to suggest a lawyer. He did. She asked him to take her to the lawyer. He then returned home, called the lawyer's office and made an appointment for the next day. The next day he took his mother to the lawyer's office. His mother told the lawyer she wanted to make her will and asked if the lawyer would write it. The lawyer agreed to write it. The lawyer and his mother conferred as to her wishes about it. He took his mother back to the attorney's office on 12 July 1973 for the purpose of executing the will. The attorney then read the will to his mother. His mother read it and said that it was like she wanted it. She executed the instrument and the attorney and his secretary witnessed it at her request. His mother asked the attorney to keep the will for her and she paid him. After this testimony the trial judge again instructed the jury that they should not consider it for the purpose of proving "the facts therein recited but only as bearing upon the question of the mental capacity of Mrs. Ricks." The propounder was then asked whether based upon his "conversation and observations" of his mother during 1970-73 and *"especially July 12, 1973"* (emphasis added), he had an opinion regarding whether the deceased possessed each of the requisite elements of testamentary capacity on July 12, 1973. To each question he replied that he had an opinion. It was that his mother had the requisite mental capacity in all respects inquired about.

[1, 2]   This is one of those cases in which the legal principles to a point are well established. The difficulty arises in applying them to the facts. It was early held that a caveator or a propounder in a will contest is a "party" to whom the prohibitions

and exceptions of General Statute 8-51 apply. *Pepper v. Brough-ton,* 80 N.C. 251 (1879). It is also the rule that a party or an interested witness may, notwithstanding General Statute 8-51, in an action to set aside a will, a deed or other writing, testify to communications or conversations with a deceased to show the basis upon which the party or witness has formed an opinion regarding the mental capacity of the deceased, when he testifies to such an opinion, and when the lack of such capacity is a ground for setting aside the instrument. *Goins v. McLoud,* 231 N.C. 655, 58 S.E. 2d 634 (1950); *In re Will of Lomax,* 226 N.C. 498, 39 S.E. 2d 388 (1946); *Rakestraw v. Pratt,* 160 N.C. 436, 76 S.E. 259 (1912); *McLeary v. Norment,* 84 N.C. 235 (1881). The reason for this rule was well put in the leading case, *McLeary v. Norment, supra* at 237-38:

"But the conversations offered are not to prove any fact stated or implied, but the mental condition of the plaintiff, as declarations are received to show the presence of disease in the physical system. How, except through observation of the acts and utterances of a person, can you arrive at a knowledge of his health of body or mind? As sanity is ascertained from sensible and sane acts and expressions, so may and must any conclusion of unsoundness be reached by the same means and the same evidence. The declarations are not received to show the truth of the things declared, but as evidence of a disordered intellect, of which they are the outward manifestations. Would it not be competent to show an attempt at self-destruction? And do not foolish and irrational utterances equally tend to show the loss of reason when proceeding from the sane person? In either case, the conduct and the language may be feigned and insincere, but this will only require a more careful scrutiny of the evidence, and does not require its total rejection. The admissibility of the witness' opinion, resting as it necessarily must, upon past opportunities of observing one's conduct, requires in order to a correct estimate of the value of the opinion, an enquiry into the facts and circumstances from which it has been formed. There seems to be no sufficient reason for receiving the opinion and excluding proof of the facts upon which it is founded."

While this rule is difficult to reconcile logically with the language of the statute it is nevertheless firmly imbedded in our

---

·In re Will of Ricks

---

law as a "rule of reason." *Cf. In re Will of Hall,* 252 N.C. 70, 77, 113 S.E. 2d 1, 6 (1960).

It has also been said that interested witnesses may not testify to transactions or communications with a deceased when these tend to show either the exercise of undue influence over him, *Hathaway v. Hathaway,* 91 N.C. 139 (1884), or the lack of it, *In re Will of Chisman,* 175 N.C. 420, 95 S.E. 769 (1918). In *Hathaway* the record[2] reveals that a devisee under an earlier instrument sought to testify that the deceased had told her with regard to a *later* instrument that "it was not her will, that she had made it because [a beneficiary under the later instrument] said that unless she gave him her property she might lie in the bed and die. I heard [this beneficiary] tell her so myself." The Court characterized the testimony as "not offered to show the want of legal capacity . . . disclosed by . . . erratic and unnatural acts and utterances . . . but *to prove facts, as such, asserted by the testatrix whereof her declarations are the only proof.*" 91 N.C. at 141. (Emphasis added.) It affirmed the trial court's ruling striking the testimony. In *Chisman,* according to the record, a daughter of the deceased and beneficiary of the script being propounded testified that in her opinion the deceased's "mind was all right as far as I could see . . . and continued so as long as she lived so far as I know. The night she died she was able to recognize us children and talked with us." Following brief testimony about the deceased's doctor and a visit to him by deceased, the witness testified that the deceased asked one Gilliam Brown if he "would get two gentlemen to witness her will." She was then asked, as appears in the opinion of the Court: "Q. What do you know about the preparation of this will, if anything?" Over objection she was permitted to testify: "She told me she had made a will willing me her property; that she had changed the first will . . . and that she copied this from the first will so that she would know it was written correctly." The Court characterized this last testimony as tending "directly to establish the will and to prove that it was the free and voluntary act of the testatrix and . . . to contradict the charge of undue influence . . ." and as being "not a casual conversation upon some indifferent subject, admitted . . . as a basis for forming an opinion upon the sanity of the testatrix, but the declarations constitute very vital evidence tending to

---

[2] Some of the details recounted in *Hathaway, Chisman,* and *In re Hinton, infra,* do not appear in the reported opinions but are taken from the records on file with the Court.

establish the will and to rebut the charge of undue influence."
175 N.C. at 422, 95 S.E. at 771. It held the admission of this
testimony prejudicial error.

In *In re Will of Kestler,* 228 N.C. 215, 44 S.E. 2d 867
(1947), on the other hand, the caveator testified that the tes-
tatrix, her aunt, had told her that "they had papers made out
that I would get what they had—if anything happened to me,
my niece [the caveator] would get it." This declaration was in-
consistent with the writing under attack which purported to
devise the testatrix's property to a stranger to the blood. The
Court said: "The purpose of this evidence was to lay, in part,
the foundation for [the witness'] opinion that [the testatrix]
was consciously incapable of making a will totally at variance
with this declaration. . . . [T]he evidence is competent on the
issue of mental incapacity. (Citations omitted.) At least its ad-
mission would not work a new trial according to our previous
decision. *In re Will of Hinton* . . . . [T]he testimony of [another
disinterested witness] quotes the same declaration of purpose
without objection."

In *In re Hinton,* 180 N.C. 206, 104 S.E. 341 (1920), a
caveat proceeding, the jury found both the existence of undue
influence and mental incapacity. On propounders' appeal the
Court found no error in the admission of the testimony of a
disinherited caveator who, having given her opinion that de-
ceased lacked testamentary capacity, testified that the deceased
had said to her, on the occasion of the death of the witness' hus-
band and son of deceased, "Don't be uneasy, I will see that you
[the testifying caveator] and your children don't suffer," and
had said to the witness' son [the deceased's grandson], "Yes, I
will look out for you and take care of you." The witness was
careful to state, however, that "what transpired . . . goes to the
formation of my opinion as to his mental capacity." Before the
witness so testified the trial judge instructed the jury: "There
may be submitted to you an issue or question as to whether . . .
the propounders procured the execution of the will by exercis-
ing undue influence over the mind of the testator. Whatever
this witness may say must not be considered upon that issue,
it is confined to the issue as to whether the testator had suffi-
cient mental capacity to make a will at the time of the execution
of the instrument." The Court, relying on the principle that evi-
dence "competent for one purpose and not for another" may be
properly admitted if instructions limiting it to the proper pur-

pose are given, found no error. The Court pointed out that when detailing conversations with a person for the purpose of demonstrating an opinion as to the person's mental state, a witness may at the same time be offering "proof of relevant facts." It said that evidence relevant to the issue of mental capacity should not be kept out on a general objection simply because it was also relevant to the issue of undue influence. The Court was of the opinion that an appropriate limiting instruction could and did solve the problem.

The transactions and communications with the deceased related in, respectively, *Hathaway, Chisman, Kestler,* and *Hinton,* seem at first to be quite similar. Close examination, however, reveals that the deceased's declarations in *Chisman* that she "had made a will . . . changed the first will . . . copied this from the first will . . . . " are statements of cognitive fact offered to prove the truth of what they assert. Likewise the deceased's declarations in *Hathaway* that she had made the contested instrument because of a veiled threat from the beneficiary therein is clearly a statement of fact the probative value of which rests on the truth of the declaration itself and not simply the fact that the declaration was made. Such testimony is hearsay and inadmissible without regard to General Statute 8-51. The declarations in *Kestler* and *Hinton,* however, are not so much statements of fact as they are indications of the declarant's state of mind and mental purposes which were inconsistent with the scripts sought to be propounded. Their probative value rests simply on the fact that they were made and not on the truth of anything they may assert. Given the exception to General Statute 8-51 carved out by *McLeary v. Norment, supra,* what seems to be operating in the later cases applying it is the hearsay rule itself.

Often the mental condition of the deceased in a caveat or other proceeding to set aside a written instrument bears on both undue influence and mental capacity issues. "But the question of undue influence and fraud is, in both the complaint and evidence, so tied up with the mental condition of the grantor . . . as to make that, perhaps, the strongest factor leading to the answer to the [fraud and undue influence] issue. Indeed, without it, the evidence of fraud and undue influence is, perhaps, too tenuous for consideration." *Goins v. McLoud, supra* at 658,

58 S.E. 2d at 637. This Court said in *In re Will of Thompson,* 248 N.C. 588, 594, 104 S.E. 2d 280, 285 (1958):

> "Because the strength or weakness of mind of a testator and his susceptibility to influence are important in determining whether undue influence was exerted, the mental and physical condition of Jerry M. Thompson, together with his age, less than two years prior to the signing by him of the challenged paper writing, is, under an issue of undue influence, a proper subject for consideration by the jury, and evidence tending to show such condition is admissible. (Citations omitted.) *This evidence was also competent on the second issue of mental capacity to make a will . . . . "* (Emphasis added.)

*See also Smith v. Keller,* 205 N.Y. 39, 98 N.E. 214 (1912). In these kinds of cases the same transactions and communications with a deceased tending to show his state of mind may tend at once to establish the existence of mental capacity and resoluteness and thereby negate undue influence, or to establish the existence of mental incapacity or weakness and thereby support the charge of undue influence.

Thus it seems an oversimplification of the rules to say that an interested witness may testify to transactions and communications with a deceased only if such testimony is considered on the mental capacity issue but not if it bears on the question of undue influence. The real distinction in the cases is whether the testimony is offered mostly to show the basis for the witnesses' opinion as to the deceased's mental condition or whether it is offered mostly to prove some other fact in issue. In the former instance the probative value of the testimony rests simply on the fact that the transactions or communications *occurred.* In the latter it rests on the truth of whatever assertions are contained in the transactions or communications related. In the former instance there is no hearsay involved and the testimony is generally admissible, while in the latter the hearsay nature of the testimony renders it inadmissible.

In *In re Will of Hall,* 252 N.C. 70, 113 S.E. 2d 1 (1960), a caveat in which the jury answered the issues of testamentary capacity and undue influence in favor of the propounders, testimony from a non-interested witness was admitted at trial to the effect that deceased had told the witness that she had had "quite a bit of trouble with a young man" named George Whit-

field; that she had bought him a Cadillac automobile, given him a deed to property in Hendersonville, had intended to marry him, had gotten a marriage license for that purpose but had been advised against the marriage by another man. Whitfield, the evidence showed, was a married man at the time. The trial court told the jury that it might consider this evidence as bearing on "the fact that [the deceased] seemed to have a transaction of that kind on her mind a good deal as it might tend to show a condition of her mind at the time . . . . But as to the exact details of what took place between [the deceased] and the young man George Whitfield . . . you will not consider them, and disregard them and erase them from your mind and do not permit them to influence you in your verdict." The caveators excepted to this instruction on the grounds that it tended to limit this evidence to the mental capacity issue and that it was error for the judge not to permit the jury to consider it on the undue influence issue. This Court, speaking through Clifton Moore, J., said, 252 N.C. at 81-82, 113 S.E. 2d at 9:

> "It is generally held that 'Declarations made either before or after the execution of the will, but not part of the *res gestae*, are mere hearsay and are not admissible as direct evidence of the exercise of fraud or undue influence. They may be received in evidence, however, to show the state and condition of the testator's mind. Thus, they may be admitted to prove or disprove his weakness of mind and consequent susceptibility to undue influence, or his feelings and attitude toward, and relations with, persons mentioned in or excluded from his will . . . . '

> "Our Court has not always followed the majority view as to admissibility and effect of testator's declarations with respect to the issue of undue influence. *In re Will of Ball,* 225, N.C. 91, 33 S.E. 2d 619. (Other citations omitted.) *In re Will of Ball, supra,* has a clear and clarifying discussion of this subject. There it is said: 'So then with us the rule comes to this. Evidence of declarations of the testator which disclose his state of mind at the time of the execution of the paper writing or the circumstances under which it was executed, tending to show he did or did not act freely and voluntarily, is competent as substantive proof of undue influence.' "

The Court held that the trial judge's limiting instructions were not prejudicial to the caveators. It said, 252 N.C. at 82, 113 S.E. 2d at 10, that the deceased's declarations

> "are not substantive evidence of the truth of the transactions referred to by her, and as to these transactions themselves her declarations are hearsay. The court admitted the testimony . . . with respect thereto as bearing upon the state of testatrix's mind. This was proper and admission for any other purpose . . . would have been error. As already indicated, caveators got the benefit of this testimony under proper instructions."

*Whitley v. Redden,* 276 N.C. 263, 171 S.E. 2d 894 (1970), was a suit on two notes against the estate of the alleged maker. The defenses were lack of mental capacity to execute the notes, failure of consideration, and lack of due execution and delivery. The plaintiff and his assignor both testified to their opinion that the deceased had mental capacity to execute the notes. They also testified to certain declarations made to them by the deceased which tended to show the *reason for the execution of the notes, the consideration supporting them and their due execution and delivery.* The trial judge admitted this evidence and instructed the jury that it was offered solely for the purpose of showing the basis for the witnesses' opinion of the deceased's mental capacity. This Court held the admission of this evidence to be error, saying, through Branch, J., 276 N.C. at 272-73, 171 S.E. 2d at 901:

> "We conclude that North Carolina is one of those states which has a 'Dead Man's' statute and allows an interested witness, where there is an issue of mental capacity, to relate personal transactions and communications between the witness and a decedent or lunatic as a *basis for his opinion as to the mental capacity of the decedent or lunatic;* however, such evidence will be rejected when it is offered for the purpose of proving and does tend to prove vital and material *facts* which will fix liability against the representative of a deceased person, or committee of a lunatic, or anyone deriving his title or interest through them. (Emphasis the Court's.)

> "The rule set forth in the case of *In re Hinton,* 180 N.C. 206, 104 S.E. 341, that evidence is admissible over a general objection if it is competent for any purpose, is not

applicable to the testimony here challenged. *The challenged testimony was so directed and weighted towards proving facts essential to establishing plaintiff's claim, rather than the basis of witnesses' opinions as to sanity, that it became impossible for the trial court to effectively remove the prejudice to defendant by a limiting instruction.* Therefore, a limiting instruction by the court could not make the evidence admissible." (Emphasis added.)

The New York Court of Appeals applied similar reasoning in *Smith v. Keller, supra,* an action to set aside a will on the *sole* ground of undue influence. Caveators stipulated that the deceased possessed the requisite testamentary capacity. It said, 205 N.Y. at 46, 49-50, 98 N.E. at 216-17:

"The court ruled: 'The evidence of the mental state of the deceased is always taken on a question of undue influence. The declarations are not evidence of the fact contained in the statement, but the evidence is competent.' The rule as stated by the court has been often upheld. *(Matter of Woodward,* 167 N.Y. 28.) Evidence of acts and conversations of a deceased bearing upon her mental strength, is not incompetent simply because it bears upon some question other than that of the mental strength of the deceased. The difficulty in this case is that counsel for the plaintiff taking advantage of a rule correctly stated by the court proceeded to call many witnesses, and from them to elicit testimony bearing in a very slight degree, if at all, on the question of the mental strength of the testatrix, but in that way he obtained a large number of declarations by her subsequent to the date of the will which were well calculated to influence the jury, and which doubtless did influence the jury in determining the question submitted to it, as to whether the will was the free and voluntary act of the testatrix.

. . . .

"Questions to elicit the mental strength of a testator should be asked for that purpose and not for an incompetent and improper purpose. . . . *Efforts to obtain from witnesses conversations, including improper and incompetent statements of fact under the guise of showing the mental strength of a testatrix, should be and are condemned,* and where, as in this case, such effort has been repeated and continuous and the evidence so obtained is to a large extent relied upon

to show undue influence and is not a mere incident in the receipt of evidence for a proper purpose, it requires that the judgment should be reversed." (Emphasis added.)

[3] We conclude that in actions to set aside written instruments executed by deceased persons on the grounds of mental incapacity where other issues such as undue influence are raised by the evidence, and where testimony of an interested witness is offered relating to transactions or communications with the deceased, the foregoing authorities support the following propositions: (1) If the probative value of such testimony rests mostly on demonstrating the basis for the witness' opinion as to the deceased's mental state, it is admissible under appropriate limiting instructions notwithstanding the provisions of General Statute 8-51. (2) If the probative value of such testimony rests mostly on demonstrating the basis for such an opinion, it is admissible under appropriate limiting instructions even when the mental state of the deceased is relevant to both the mental capacity and undue influence issues. (3) If the probative value of such testimony rests mostly on its tendency to prove certain facts in issue relevant to issues other than the deceased's mental state, General Statute 8-51 and the hearsay rule render it inadmissible and limiting instructions will not cure the prejudice resulting from its admission.

[4] Applying these principles to the facts before us, we do not believe the admission under the limiting instructions here given of the challenged testimony of the propounder was error. The transactions and communications with the deceased which he related, considered in the context of his other testimony and other evidence in the case, seem clearly to have been offered mostly for the purpose of showing the basis for his opinion that his mother at the crucial time in question had the mental capacity to execute a will. The declarations or statements which he attributed to the deceased were not offered primarily to prove the truth of any assertion contained therein. Their probative value depends more on the fact that they were made. The declarations themselves are evidence of the deceased's strong and resolute mental state and firm purpose to do what she did.

The real battleground in this proceeding was the mental state of the deceased. The caveators claimed she was mentally weak, lacking in testamentary capacity, and easily led by the suggestions of others. The propounder claimed precisely the

opposite. The evidence of undue influence was sparse. If there was any at all, it consisted of the caveators' evidence of the deceased's weakened mental and physical condition, the results of the will itself, and the propounder's evidence of his own involvement in assisting his mother to get the will prepared. Unlike *Whitley v. Redden, supra,* there were no other issues in the case. Unlike *Chisman* and *Hathaway* the declarations of the deceased here related were not so much statements of fact which depended for their probative worth on the truth of the assertions contained therein but were more akin to those held properly admitted in *Kestler* and under proper limiting instructions in *Hinton.*

We note, furthermore, that testimony of similar import to the testimony of the propounder came in without objection through the lawyer who prepared the will, his secretary, and the propounder's wife. *See In re Will of Hinton, supra.*

[5] We now consider briefly another assignment of error raised by the caveators in the Court of Appeals and brought forward in their new brief filed here. The caveators contend that the trial court committed prejudicial error in allowing propounder's wife to testify to statements made to her by the deceased some four days before the execution of the script, concerning her reasons for wanting to leave her home to the propounder. These statements were to the effect that the propounder's father had built the house for him while he was in service, had stopped work on it while the propounder was listed as missing in action, and resumed construction when the propounder was later determined to be safe. This witness testified that the deceased on this occasion said, "That house was built for my son." Caveators contend that this testimony amounts to the admission of hearsay evidence and was prejudicial to them. Propounder contends that the evidence is admissible to show the basis upon which this witness expressed her opinion that at the crucial time in question the deceased possessed the requisite testamentary capacity and to show a resolute state of mind on the part of the deceased not likely to be susceptible to over-reaching on the part of others.

In the context of all the evidence presented, we are inclined to agree with the position of the propounder. It is true that insofar as the purpose of this evidence was to prove, in fact, the reason for the home's being built it was hearsay. We be-

lieve, however, that the thrust of this evidence was not so much to show why in fact the home was built but rather that the deceased herself was conscious of a reason, whether true or not. The thrust of this evidence, in other words, was to show the deceased's state of mind regarding her property and to show that she had a fixed purpose to dispose of it according to the instrument in question. Whether in fact the propounder's father built the house for him while he was in service is relatively unimportant in the context of this case. What is important is what the deceased thought about it as revealed by her statements on the subject. The evidence, in other words, was offered mostly for the purpose of revealing the deceased's state of mind. Its probative value rested mostly on the fact that deceased made the statements and not the truth of anything asserted in them. As such it was not hearsay and not error to admit it.

The last assignment of error brought forward by the caveators in their new brief is to the failure of the trial judge to allow their motion to set aside the verdict as being contrary to the weight of the evidence. Inasmuch as a ruling of this sort is within the sound discretion of the trial judge and the evidence in the case was, in fact, highly conflicting on the crucial issue of the deceased's mental capacity, we find no error on this point.

The verdict and judgment of the trial court are sustained. The decision of the Court of Appeals awarding a new trial is

Reversed.

Chief Justice SHARP and Associate Justices HUSKINS and COPELAND dissent for the reasons stated by BROCK, Chief Judge, in the opinion of the Court of Appeals in this case.